UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Civil Action No. _____

|  |  |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE INDEMNITY COMPANY; ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY; ALLSTATE NEW JERSEY INSURANCE COMPANY; AND ALLSTATE NEW JERSEY PROPERTY AND CASUALTY INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| JOHN S. LYONS, M.D.; SANNA KALIKA, M.D.; ILYA BURSHTEYN, M.D.; HARVEY STERN, M.D.; JOSEPH MCCARTHY, M.D.; RICHARD DENISE, M.D.; RIGHT AID DIAGNOSTIC MEDICINE, P.C.; A PLUS MEDICAL P.C.; OMEGA MEDICAL DIAGNOSTIC, P.C.; SHORE MEDICAL DIAGNOSTIC, P.C.; ORACLE RADIOLOGY OF NY P.C.; ATLANTIC RADIOLOGY IMAGING P.C.; ATLANTIC RADIOLOGY, P.C.;  AURORA RADIOLOGY P.C.; DAVID GOLUB; ARTHUR BOGORAZ; SIMON KORENBLIT; EDWARD ATBAYSHAN; ALEXANDER ZHAROV; AND ALMA BUILDING, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## **COMPLAINT**

The plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate

Property and Casualty Insurance Company, Allstate Fire and Casualty Insurance Company,

Allstate New Jersey Insurance Company, and Allstate New Jersey Property and Casualty

Insurance Company (collectively "Allstate" and/or "Plaintiffs"), by its attorneys, Smith & Brink,

P.C., allege as follows:

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................4

II.  THE PARTIES...................................................................................................7

    A.  Plaintiffs ...................................................................................................7

    B.  Defendants ................................................................................................8

        1.  Licensed Medical Providers.......................................................8

        2.  PC Defendants .............................................................................9

        3.  Management Defendants ............................................................11

III.  JURISDICTION AND VENUE ......................................................................14

IV.  SPECIFIC FACTS DETAILING DEFENDANTS' MEDICAL FRAUD .......14

    A.  Lyons' Reports Rely on Limited Magnetic Resonance Studies Using Non-Diagnosable Techniques ...........................................................14

    B.  Lyons Relies on Suboptimal Imaging .................................................17

    C.  Lyons' Diagnoses and Findings Cannot be Substantiated ....................17

V.  SPECIFIC INSTANCES OF FABRICATED MRI REPORTS .......................19

VI.  FACTUAL ALLEGATIONS REGARDING THE ILLEGAL CORPORATE PRACTICE OF MEDICINE...........................................................................41

    A.  No-Fault Laws and Licensing Statutes .................................................42

    B.  Specific Evidence of Unlawful Corporate Practice of Medicine...........45

        1.  Wagner & Oracle .......................................................................45

        2.  Babigian & Oracle .....................................................................47

        3.  Kalika & Right Aid.....................................................................48

        4.  Atlantic Imaging and Atlantic Radiology .................................50

a.     Atlantic Imaging Succeeds Atlantic Radiology ............................ 50

b.     Stern Admitted That Atlantic Imaging is Unlawfully Operated and Controlled by Korenblit, Atbayshan and Zharov ................... 50

c.     Atlantic Imaging's Management Controlled All Aspects of the Business ...................................................................................... 51

d.     Stern Becomes Paper Owner of Atlantic ...................................... 52

e.     Atlantic Radiology Controlled by Laypersons ............................ 53

f.     Atlantic Radiology Continues to Bill Allstate ............................. 54

5.     DeNise & Aurora ................................................................................. 54

6.     Concealment of Unlawful Corporate Structure by Other PC Defendants ......................................................................................... 55

7.     Lay-Owned Medical Clinics Conspired with Lyons ............................ 56

VII.     SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY .......... 57

VIII.     ALLSTATE'S JUSTIFIABLE RELIANCE ................................................... 59

IX.     DAMAGES ..................................................................................... 60

X.     CAUSES OF ACTION ....................................................................... 61

XI.     DEMAND FOR RELIEF ...................................................................... 85

XII.     JURY TRIAL DEMAND ...................................................................... 89

## I.   **INTRODUCTION**

1.      This is a case about doctors for hire.

2.      John Lyons, M.D. ("Lyons"), a licensed radiologist, conspired with physicians Sanna Kalika, M.D. ("Kalika"), Ilya Burshteyn, M.D. ("Burshteyn"), Harvey Stern, M.D. ("Stern"), Joseph McCarthy ("McCarthy"), Richard DeNise, M.D. ("DeNise"), and several professional corporations, including Right Aid Diagnostic Medicine P.C. ("Right Aid"), A Plus Medical P.C. ("A Plus"), Omega Medical Diagnostic, P.C. ("Omega"), Shore Medical Diagnostic, P.C. ("Shore"), Oracle Radiology of NY P.C. ("Oracle"), Atlantic Radiology Imaging P.C. ("Atlantic Imaging"), Atlantic Radiology P.C. ("Atlantic Radiology") and Aurora Radiology P.C. ("Aurora") (collectively "PC Defendants," "PC," and/or "PCs"), and managers ALMA Building, LLC ("ALMA"), David Golub ("Golub"), Arthur Bogoraz ("Bogoraz"), Simon Korenblit ("Korenblit"), Edward Atbayshan ("Atbayshan"), and Alexander Zharov ("Zharov") (collectively "Defendants"), to induce Allstate into paying $4,739,572.76 for unnecessary medical services, including the provision of expensive Magnetic Resonance Imaging ("MRI") studies that were of non-diagnosable quality, served no legitimate medical purpose, and appear to be wholly fabricated.

3.      The defendants also misrepresented the corporate ownership of the PC Defendants and their eligibility to pursue No-Fault Insurance benefits under New York law. Kalika was the paper owner of Right Aid, Burshteyn was the paper owner of A Plus, Omega, and Shore, Stern was the paper owner of Atlantic Imaging, McCarthy was the paper owner of Atlantic Radiology, and DeNise was the paper owner of Aurora.  At one point, Ronald Wagner M.D. ("Wagner") was the paper owner of Oracle until it was purportedly sold to Gregory Vahan Babigian, M.D. ("Babigian").

4.      The facts and circumstances surrounding the ownership and operation of the PC Defendants evidence "doc-in-the-box" schemes where the nominal owners sell their medical license and name directly to a layperson manager/owner, or to a management company owned and operated by laypersons.  In violation of New York law, the revenues generated by the PCs are siphoned off to the non-licensed layperson owners.

5.      While the PC Defendants appeared to be properly incorporated on paper, these PCs were actually owned and controlled by unlicensed layperson(s), in violation of New York law.

6.      Despite corporate records listing Wagner and Babigian as owners, Oracle was actually controlled by ALMA, a lay corporation owned by non-licensed businessmen Golub and Bogoraz.

7.      Despite corporate records filed with the State of New York Department of Education's Office of the Professions listing Stern as its owner, Atlantic Imaging was actually controlled by non-licensed businessmen Korenblit, Atbayshan, and Zharov.

8.      Despite corporate records filed with the State of New York Department of Education's Office of the Professions listing McCarthy as its owner, Atlantic Radiology was actually controlled by non-licensed businessmen Korenblit, Atbayshan, and Zharov.

9.      Despite corporate records filed with the State of New York Department of Education's Office of the Professions listing a licensed physician as their owner, Right Aid, A Plus, Omega, Shore, and Aurora were similarly operated and controlled by non-licensed businesspersons, and/or layperson owned management companies.

10.     All the PC Defendants have operated in a similar fraudulent manner.

11.     Each PC Defendant purportedly provided diagnostic tests to Allstate claimants in

furtherance of their scheme to unlawfully collect millions of dollars in No-Fault benefits that the PC Defendants were not legally entitled to collect.

12.    Lyons analyzed and interpreted the MRI studies purportedly performed at the PCs.

13.    Lyons' MRI reports reveal a pattern of MRI scans that served no legitimate diagnostic purpose.

14.    In connection with these illegitimate MRIs, the defendants fabricated medical records, invoices, bills and other insurance claim documents that were transmitted to Allstate through the U.S. Mail.

15.    Allstate reasonably relied on these false medical documents in paying No-Fault claims submitted by (or on behalf of) the PC Defendants.

16.    In reliance on defendants' submissions, Allstate paid over four million dollars to the PC Defendants.

17.    All of the conduct alleged herein was undertaken intentionally.

18.    By this pleading, Allstate brings claims against the defendants seeking money damages for: (a) violations of the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c)-(d); (b) common law fraud; (c) unjust enrichment; and (d) unfair and deceptive business acts and practices under N.Y. Gen. Bus. Law §349.

19.    Allstate's claim for compensatory damages includes: (a) first party insurance payments made by Allstate to the defendants in reliance upon the purported provision of necessary medical treatment and MRI scans; (b) treble damages; (c) statutory interest; and (d) attorneys fees.

20.    Allstate also seeks a declaration that the defendants have no right to receive

payment for any unpaid bills whereas: (a) the PC Defendants were fraudulently incorporated, and therefore ineligible to seek or recover No-Fault benefits; (b) the defendants intentionally and knowingly submitted medical documentation – namely "NF-3" verification forms – representing that the PC Defendants were organized in accordance with New York law; (c) the defendants repeatedly misrepresented the actual treating physician on NF-3 Forms; and (d) defendants engaged in a pervasive pattern and practice of submitting false medical documentation through the U.S. Mail demanding payment from Allstate.

## II.    THE PARTIES

### A.    PLAINTIFFS

21.    Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company are wholly owned subsidiaries of The Allstate Corporation, an entity organized to exist under and by virtue of the laws of the State of Delaware.

22.    Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company maintain their principal places of business in Northbrook, Illinois.

23.    Allstate New Jersey Insurance Company and Allstate New Jersey Property and Casualty Insurance Company maintain their principal place of business in Bridgewater, New Jersey.

24.    Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

25. Allstate New Jersey Insurance Company Allstate New Jersey Property and Casualty Company are authorized to conduct business and to issue policies of automobile insurance in the State of New Jersey.

**B.** **DEFENDANTS**

   1. LICENSED MEDICAL PROVIDERS

26. John Lyons, M.D. resides in and is a citizen of the State of New Jersey.

27. At all relevant times, Lyons was licensed by the State of New York to practice medicine.

28. Sanna Kalika, M.D. resides in and is a citizen of the State of New Jersey.

29. At all relevant times, Kalika was licensed by the State of New York to practice medicine.

30. Ilya Burshteyn, M.D. resides in and is a citizen of the State of New York.

31. At all relevant times, Burshteyn was licensed by the State of New York to practice medicine.

32. Harvey Stern, M.D. resides in and is a citizen of the State of New York.

33. At all relevant times, Stern was licensed by the State of New York to practice medicine.

34. Joseph McCarthy, M.D. resides in and is a citizen of the State of New York.

35. At all relevant times, McCarthy was licensed by the State of New York to practice medicine.

36. Richard DeNise, M.D. resides in and is a citizen of the State of New York.

37. At all relevant times, DeNise was licensed by the State of New York to practice medicine.

8

2.     PC DEFENDANTS

a.     <u>Right Aid Diagnostic Medicine P.C.</u>

38.     Right Aid Diagnostic Medicine is a New York medical Professional Service Corporation with a principal place of business located at 82-73 Parsons Boulevard, Jamaica, NY.

39.     According to the State of New York Department of Education's Office of the Professions, Kalika is listed as the owner of Right Aid.

40.     At all relevant times, Right Aid contracted with Lyons to perform the professional component of the radiologic studies purportedly conducted at Right Aid.

b.     <u>A Plus Medical P.C.</u>

41.     A Plus Medical is a New York medical Professional Service Corporation that does business at 95-01 103rd Avenue, Ozone Park, NY and 1401 Ocean Avenue, Suite D, Brooklyn, NY.

42.     According to the State of New York Department of Education's Office of the Professions, Burshteyn is listed as the owner of A Plus.

43.     At all relevant times, A Plus contracted with Lyons to perform the professional component of the radiologic studies purportedly conducted at A Plus.

c.     <u>Omega Medical Diagnostic, P.C.</u>

44.     Omega Medical Diagnostic is a New York medical Professional Service Corporation with a principal place of business located at 1401 Ocean Avenue, Suite D, Brooklyn, NY.

45.     Omega also does business at 97-05 101st Avenue, Ozone Park, NY.

46.     According to the State of New York Department of Education's Office of the Professions, Burshteyn is listed as the owner of Omega.

47.     Omega is the predecessor-in-interest to Shore.

48.     At all relevant times, Omega contracted with Lyons to perform the professional component of the radiologic studies purportedly conducted at Omega.

d.     Shore Medical Diagnostic, P.C.

49.     Shore Medical Diagnostic is a New York medical Professional Service Corporation with a principal place of business located at 1401 Ocean Avenue, Suite D, Brooklyn, NY.

50.     Shore also does business at 97-05 101st Avenue, Ozone Park, NY.

51.     According to the State of New York Department of Education's Office of the Professions, Burshteyn is listed as the owner of Shore.

52.     At all relevant times, Shore contracted with Lyons to perform the professional component of the radiologic studies purportedly conducted at Shore.

e.     Oracle Radiology of NY P.C.

53.     Oracle Radiology of NY is a New York medical Professional Service Corporation with a principal place of business located at 95-01 103rd Avenue, Ozone Park, NY.

54.     Wagner was listed as the owner of Oracle until he sold the practice to Babigian.

55.     According to the State of New York Department of Education's Office of the Professions, Babigian is presently listed as the owner of Oracle.

56.     At all relevant times, Oracle contracted with Lyons to perform the professional component of the radiologic studies purportedly conducted at Oracle.

f.     Atlantic Radiology Imaging, P.C.

57.     Atlantic Radiology Imaging is a New York medical Professional Service Corporation with a principal place of business located at 105 Kings Highway, Brooklyn, NY.

58.     According to the State of New York Department of Education's Office of the Professions, Stern is listed as the owner of Atlantic Imaging.

59.     At all relevant times, Atlantic Imaging contracted with Lyons to perform the professional component of the radiologic studies conducted at Atlantic Imaging.

g.     Atlantic Radiology P.C.

60.     Atlantic Radiology is a New York medical Professional Service Corporation with a principal place of business located at 105 Kings Highway, Brooklyn, NY.

61.     According to the State of New York Department of Education's Office of the Professions, McCarthy was listed as the owner of Atlantic Radiology.

62.     At all relevant times, Atlantic Radiology contracted with Lyons to perform the professional component of the radiologic studies conducted at Atlantic Radiology.

h.     Aurora Radiology P.C.

63.     Aurora Radiology is a New York medical Professional Service Corporation with a principal place of business located at 95-01 103rd Avenue, Ozone Park, NY.

64.     According to the State of New York Department of Education's Office of the Professions, DeNise is listed as the owner of Aurora.

65.     According to the New York Department of State Division of Corporations, at the time Aurora was incorporated, Aurora was owned by Lyons.

66.     DeNise is presently listed as the owner of Aurora.

3.     MANAGEMENT DEFENDANTS

a.     ALMA Building, LLC

67.     ALMA Building is a New York corporation with a principal place of business located at 95-01 103rd Avenue, Ozone Park, New York.

68.     At all relevant times, ALMA was Oracle's management company, and has been used as a tool to: (a) illegally own and control Oracle, and (b) illegally divert revenues generated by Oracle through billings submitted to Allstate for medical services.

69.     Golub and Bogoraz have an ownership interest in, and/or exert control over ALMA.

        b.     <u>David Golub</u>

70.     Golub resides in and is a citizen of the State of New York.

71.     Golub is a non-licensed layperson who, at all relevant times, was an owner of ALMA.

72.     Golub has never been a licensed medical professional.

73.     Golub, through ALMA, actually controlled and operated Oracle in violation of New York law.

        c.     <u>Arthur Bogoraz</u>

74.     Bogoraz resides in and is a citizen of the State of New Jersey.

75.     Bogoraz is a non-licensed layperson who, at all relevant times, was an owner of ALMA.

76.     Bogoraz has never been a licensed medical professional.

77.     Bogoraz, through ALMA, actually controlled and operated Oracle in violation of New York law.

        d.     <u>Simon Korenblit</u>

78.     Korenblit resides in and is a citizen of the State of New York.

79.     Korenblit has never been a licensed medical professional.

80.     Korenblit actually controlled and operated Atlantic Radiology in violation of New

York law.

81.     Korenblit actually controlled and operated Atlantic Imaging in violation of New York law.

### e.     Edward Atbayshan

82.     Atbayshan resides in and is a citizen of the State of New York.

83.     Atbayshan has never been a licensed medical professional.

84.     Atbayshan actually controlled and operated Atlantic Radiology in violation of New York law.

85.     Atbayshan actually controlled and operated Atlantic Imaging in violation of New York law.

### f.     Alexander Zharov

86.     Zharov resides in and is a citizen of the State of New York.

87.     Zharov has never been a licensed medical professional.

88.     Zharov actually controlled and operated Atlantic Radiology in violation of New York law.

89.     Zharov actually controlled and operated Atlantic Imaging in violation of New York law.

### g.     Other Management Defendants

90.     The other PC Defendants identified above (namely Right Aid, A Plus, Omega, Shore, and Aurora) were nominally owned by their respective "paper owners." These entities, however, were actually controlled and operated by management companies and/or unlicensed businesspersons whose identities are presently unknown.

91.     The specific facts that evidence the layperson ownership of the PC Defendants are

set forth with particularity in Section VI below.

## III.   JURISDICTION AND VENUE

92.     Jurisdiction over this action is conferred upon this Court by 28 U.S.C. §1331,

§1332, 18 U.S.C. §1962(c)-(d), and 18 U.S.C. §1964.  Supplemental jurisdiction over the state

law claims is proper under 28 U.S.C. §1367.

93.     Venue is proper under 28 U.S.C. §1391(c) whereas the vast majority of the

wrongful acts known to Allstate as alleged herein with particularity were carried out within the

Eastern District of New York.

## IV.   SPECIFIC FACTS DETAILING DEFENDANTS' MEDICAL FRAUD

94.     At all relevant times, the PC Defendants contracted with Lyons to read and

interpret MRIs and other diagnostic studies purportedly performed at the respective PCs.

95.     A review of Lyons' medical documentation evidenced a pattern of reports that

misrepresented the actual pathology contained in the films.

96.     In some instances, Lyons falsely duplicated MRI reports for multiple patients.

97.     In some instances, Lyons falsely identified conditions that did not appear on the

actual MRI images he purportedly interpreted.

98.     In other instances, Lyons falsely diagnosed conditions that did not exist.

99.     Lyons' MRI findings/reports and the underlying MRI images do not correlate, and

are therefore false and fraudulent, because: (a) the images provided to Lyons are limited; (b) the

images were derived using improper and inadequate techniques; and (c) the images are of such

poor quality that they are incapable of any legitimate diagnostic purpose.

### A.   LYONS' REPORTS RELY ON LIMITED MAGNETIC RESONANCE STUDIES USING NON-DIAGNOSABLE TECHNIQUES

100.    In each instance, the respective PC performed a limited study using inadequate

14

techniques.

101.     To obtain a legitimate MRI study, a radiologist must manipulate the parameters of the scanner in a manner best suited to detect pathology.

102.     The spinal scans analyzed by Lyons did not include proper sequences, and did not image the requisite volume of tissue.

103.     For example, in performing a cervical spine scan, the PCs uniformly performed only the following sequences: (a) a T1 sagittal image; (b) a gradient echo sagittal sequence; and (c) a gradient echo axial image.

104.     Gradient echo images are not an acceptable technique for the evaluation of intrinsic spinal cord pathology.

105.     Gradient echo images are limited because they do not scan the entire volume of tissue in the cervical spine.  A scan of the entire volume of tissue is required for an accurate diagnosis.

106.     The T1 sagittal sequence is similarly limited because it is only useful in indentifying spinal cord compressions.

107.     To ensure a complete MRI study, the PCs should have used the T2 weighted sequence with fat suppression ("T2FS") or STIR imaging when imaging the shoulder, knees, cervical and lumbar spine in the long axis.

108.     The T2FS technique allows a radiologist to focus their analysis on the area of the patient's anatomy that is likely to harbor pathology, and maximizes a radiologist's opportunity to detect pathology.

109.     T2FS are required to examine the spinal cord and bony structures for contusions and intrinsic spinal cord pathology (e.g., demyelinating disease, tumors, and numerous other

disease entities).

110.    T2FS are further required in the knees and shoulders to diagnose a tearing of the rotator cuff or menisci and effusion.

111.    T2FS, and not the limited studies actually performed by the defendants, are the appropriate images needed to detect pathology resulting from a trauma such as a motor vehicle accident.

112.    None of the MRI scans purportedly analyzed by Lyons utilized T2FS.

113.    None of the MRI scans purportedly analyzed by Lyons utilized fat suppression techniques allowing for an unobstructed view of a patient's pathology.

114.    Axial spine images are further limited because the cross-sectional imaging contained in these images did not meet the generally accepted industry standard.

115.    The industry standard in spine imaging requires a radiologist to obtain approximately 26-28 cross-section images (i.e., "slices") through each level of the spine.  Each "slice" measures approximately 5 mm with a .8 mm gap between "slices."  This precision allows a radiologist to review the entire anatomy to determine whether any pathology exists.

116.    The MRI images produced by the PC Defendants contained only one or two slices through each level of the spine (as opposed to the required 26-28 slices).

117.    The defendants' inadequate images result in intervals exceeding one centimeter in length that are not imaged and, therefore, not analyzed.

118.    A reviewing radiologist cannot fully assess the patient's anatomy using such an incomplete study.

119.    The defendants' limited studies are often the result of slower scanners that require additional time to perform a proper MRI scan.

120.    Rather than performing each scan properly, the PC Defendants generated inadequate studies of poor quality, which prevented a proper diagnosis.

**B.    LYONS RELIES ON SUBOPTIMAL IMAGING**

121.    In general, the defendants' MRI images are of suboptimal or non-diagnosable quality.

122.    Most images generated by the PC Defendants are suboptimal because the images are blurry, indicating a low signal-to-noise or contrast-to-noise ratio.

123.    When background noise or other external interference is increased, the resulting MRI image becomes blurry and difficult to read.

124.    There are many factors that will reduce the signal-to-noise or contrast-to-noise ratios such as artifacts, motion, a body that is unsuited for an optimal image, or improper tuning or calibration of the MRI scanner.

125.    This pattern of suboptimal quality MRIs, however, indicates that the MRI machines are obsolete, not regularly maintained, and not properly calibrated.

126.    In most instances, these images are so poor that a radiologist could not adequately analyze the image and make a meaningful diagnosis.

127.    Despite suboptimal imaging, Lyons purportedly relied on these images to render diagnoses that justified his radiologic services (and the services of the respective PC Defendant), fees, and further medical treatment by the referring physician(s).

**C.    LYONS' DIAGNOSES AND FINDINGS CANNOT BE SUBSTANTIATED**

128.    Without adequate images, Lyons' reports/findings are not medically justified, and appear fabricated.

129.    For each body part, Lyons' interpretations are all suspiciously similar and nearly

identical.

130.    In the knee, for example, Lyons routinely found a posterolateral or medial meniscal tear, or posteromedial capsular tear with effusion.

131.    In the shoulder, Lyons routinely found a conjoined tendon swelling with an effusion.

132.    In the lumbar spine, Lyons routinely found a subligamentous L5-S1 herniation, and levo- or dextro-curvature.

133.    In the cervical spine, Lyons routinely found disc disease or spondylosis, and levo- or dextro-curvature (i.e., scoliosis).

134.    Lyons referred patients back to the referring physician requesting correlation to confirm the MRI findings, even though the patients were initially referred for an MRI to answer those precise clinical questions.

135.    Lyons often recommended inappropriate discography even though there is no diagnostic utility in this outdated and invasive study.

136.    Lyons routinely ignored findings that were obvious on the MRI study.

137.    The constant discrepancy between Lyons' findings and the information actually contained on the MRI films supports the conclusion that Lyons did not review the MRI films.

138.    These bogus MRI reports were created to deceive Allstate into believing MRI studies, as well as the additional medical treatment provided by the referring physicians and/or chiropractors based on the results of Lyons' MRI studies, were necessary and compensable medical services under New York's No-Fault Insurance laws.

## V.   SPECIFIC INSTANCES OF FABRICATED MRI REPORTS

### A.   A.M.[1] CLAIM

139.   Allstate claimant A.M. (Claim No. 4145285740), claimed soft tissue injuries as a result of a motor vehicle accident.

140.   On October 30, 2007, A.M. received an MRI scan of the left shoulder at Right Aid.

141.   On or about October 30, 2007, Lyons analyzed A.M.'s scan and prepared a report on behalf of Right Aid.

142.   Lyons made the following written findings in his medical report: (1) SLAP I labral tear; (2) tenosynovitis/bursitis; and (3) AC joint arthrosis.

143.   None of the findings made by Lyons exist on the MRI scan.

144.   Lyons' findings concerning A.M.'s left shoulder MRI scan constitute a clear misrepresentation of A.M.'s physical condition and injuries.

145.   Thereafter, Right Aid submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to A.M.

146.   Allstate reasonably relied upon Right Aid's false medical documentation in paying No-Fault benefits to or on behalf of A.M. that were otherwise non-compensable under New York State law.

### B.   K.C. CLAIM

147.   Allstate claimant K.C. (Claim No. 4144796407), claimed soft tissue injuries as a result of a motor vehicle accident.

---

[1] To protect the confidentiality of Allstate's claimants, Allstate refers herein to each claimant/patient by their initials and Allstate claim number.

148.    On November 24, 2006, K.C. received an MRI scan of his lumbar spine at Right Aid.

149.    On or about November 24, 2006, Lyons analyzed K.C.'s scan and prepared a report on behalf of Right Aid.

150.    Lyons made the following written findings in his medical report: (1) L5-S1 annular tear; (2) L4-5 disc bulge; and (3) levocurvature.

151.    Despite Lyons' findings, no annular tear is identifiable and there is no abnormal curvature of the spine.

152.    Lyons' findings concerning K.C.'s lumbar spine MRI scan constitute a clear misrepresentation of K.C.'s physical condition and injuries.

153.    Thereafter, Right Aid submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to K.C.

154.    Allstate reasonably relied upon Right Aid's false medical documentation in paying No-Fault benefits to or on behalf of K.C. that were otherwise non-compensable under New York State law.

### C.    T.H. CLAIM

155.    Allstate claimant T.H. (Claim No. 4145240760), claimed soft tissue injuries as a result of a motor vehicle accident.

156.    On October 15, 2007, T.H. received an MRI scan of her right knee at Right Aid.

157.    On or about October 15, 2007, Lyons analyzed T.H.'s scan and prepared a report on behalf of Right Aid.

158.    Lyons made the following written findings in his medical report: (1)

posterolateral meniscal tear; (2) synovitis; and (3) mild degenerative meniscal changes.

159.    None of the findings made by Lyons exist on the MRI scan.

160.    Lyons' findings concerning T.H.'s right knee MRI scan constitute a clear misrepresentation of T.H.'s physical condition and injuries.

161.    Thereafter, Right Aid submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to T.H.

162.    Allstate reasonably relied upon Right Aid's false medical documentation in paying No-Fault benefits to or on behalf of T.H. that were otherwise non-compensable under New York State law.

**D.    L.F. CLAIM**

163.    Allstate claimant L.F. (Claim No. 4145068880), claimed soft tissue injuries as a result of a motor vehicle accident.

164.    On July 13, 2007, L.F. received an MRI scan of the left knee at Right Aid.

165.    On or about July 13, 2007, Lyons analyzed L.F.'s scan and prepared a report on behalf of Right Aid.

166.    Lyons made the following written findings in his medical report: (1) meniscal tears; (2) synovitis; and (3) mild degenerative meniscal changes.

167.    None of the findings made by Lyons exist on the MRI scan.

168.    Lyons' findings concerning L.F.'s left knee MRI scan constitute a clear misrepresentation of L.F.'s physical condition and injuries.

169.    Thereafter, Right Aid submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly

provided to L.F.

170.     Allstate reasonably relied upon Right Aid's false medical documentation in paying No-Fault benefits to or on behalf of L.F. that were otherwise non-compensable under New York State law.

     **E.**     **I.B. CLAIM**

171.     Allstate claimant I.B. (Claim No. 2126614839), claimed soft tissue injuries as a result of a motor vehicle accident.

172.     On April 30, 2007, I.B. received an MRI scan of the lumbar spine at Right Aid.

173.     On or about April 30, 2007, Lyons analyzed I.B.'s scan and prepared a report on behalf of Right Aid.

174.     Lyons made the following written findings in his medical report: (1) L5-S1 subligamentous herniation; (2) L4-5 disc bulge; and (3) shallow levocurvature.

175.     None of the findings made by Lyons exist on the MRI scan.

176.     Lyons also reports that "in the given clinical setting, clinical correlation is requested to rule out a subligamentous herniation."

177.     This request is perplexing given that the MRI was ordered specifically to rule out herniated nucleus pulposus.

178.     Lyons' findings concerning I.B.'s lumbar spine MRI scan constitute a clear misrepresentation of I.B.'s physical condition and injuries, and Lyons' request for subsequent clinical correlation supports the conclusion that Lyons' MRI interpretation was nothing more than a worthless service.

179.     Thereafter, Right Aid submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly

provided to I.B.

180.    Allstate reasonably relied upon Right Aid's false medical documentation in

paying No-Fault benefits to or on behalf of I.B. that were otherwise non-compensable under New

York State law.

**F.    P.G. CLAIM**

181.    Allstate claimant P.G. (Claim No. 4144848282), claimed soft tissue injuries as a

result of a motor vehicle accident.

182.    On November 30, 2006, P.G. received an MRI scan of the lumbar spine at Right

Aid.

183.    On or about November 30, 2006, Lyons analyzed P.G.'s scan and prepared a

report on behalf of Right Aid.

184.    Lyons made the following written findings in his medical report: (1) L4-5 annular

tear and/or subligamentous herniation; and (2) mild dextrocurvature.

185.    None of the findings made by Lyons exist on the MRI scan.

186.    Lyons' findings concerning P.G.'s lumbar spine MRI scan constitute a clear

misrepresentation of P.G.'s physical condition and injuries.

187.    On October 26, 2006, P.G. also received an MRI scan of the left shoulder at Right

Aid.

188.    On or about October 26, 2006, Lyons analyzed P.G.'s scan and prepared a report

on behalf of Right Aid.

189.    Lyons made the following written findings in his medical report: (1)

tendinopathy/synovitis bursitis; (2) degenerative changes; and (3) mild impingement.

190.    None of the findings made by Lyons exist on the MRI scan.

191.    Lyons' findings concerning P.G.'s left shoulder MRI scan constitute a clear misrepresentation of P.G.'s physical condition and injuries.

192.    Thereafter, Right Aid submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to P.G.

193.    Allstate reasonably relied upon Right Aid's false medical documentation in paying No-Fault benefits to or on behalf of P.G. that were otherwise non-compensable under New York State law.

### G.    G.P. CLAIM

194.    Allstate claimant G.P. (Claim No. 212729397), claimed soft tissue injuries as a result of a motor vehicle accident.

195.    On August 9, 2007, G.P. received an MRI scan of the lumbar spine at Right Aid.

196.    On or about August 9, 2007, Lyons analyzed G.P.'s scan and prepared a report on behalf of Right Aid.

197.    Lyons made the following written findings in his medical report: (1) L5-S1 subligamentous herniation; (2) L3-4 disc bulge; (3) L4-5 disc bulge; and (4) mild to moderate dextrocurvature.

198.    None of the findings made by Lyons exist on the MRI scan.

199.    Lyons' findings concerning G.P.'s lumbar spine MRI scan constitute a clear misrepresentation of G.P.'s physical condition and injuries.

200.    Thereafter, Right Aid submitted false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to G.P.

201.    Allstate reasonably relied upon Right Aid's false medical documentation in

paying No-Fault benefits to or on behalf of G.P. that were otherwise non-compensable under New York State law.

**H.   E.G. CLAIM**

202.   Allstate claimant E.G. (Claim No. 4145124683), claimed soft tissue injuries as a result of a motor vehicle accident.

203.   On July 25, 2007, E.G. received an MRI scan of the lumbar spine at Right Aid.

204.   On or about July 25, 2007, Lyons analyzed E.G.'s scan and prepared a report on behalf of Right Aid.

205.   Lyons made the following written findings in his medical report: (1) L5-S1 subligamentous herniation; (2) L3-4 disc bulge; (3) L4-5 disc bulge; and (4) moderate levocurvature.

206.   None of the findings made by Lyons exist on the MRI scan.

207.   Lyons' findings concerning E.G.'s lumbar spine MRI scan constitute a clear misrepresentation of E.G.'s physical condition and injuries.

208.   Thereafter, Right Aid submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to E.G.

209.   Allstate reasonably relied upon Right Aid's false medical documentation in paying No-Fault benefits to or on behalf of E.G. that were otherwise non-compensable under New York State law.

**I.   R.S. CLAIM**

210.   Allstate claimant R.S. (Claim No. 2126614839), claimed soft tissue injuries as a result of a motor vehicle accident.

211.    On May 7, 2007, R.S. received an MRI scan of the lumbar spine at Right Aid.

212.    On or about May 7, 2007, Lyons analyzed R.S.'s scan and prepared a report on behalf of Right Aid.

213.    Lyons made the following written findings in his medical report: (1) L5-S1 subligamentous herniation; (2) L4-5 disc bulge; and (3) mild dextrocurvature.

214.    None of the findings made by Lyons exist on the MRI scan.

215.    Lyons' findings concerning R.S.'s lumbar spine MRI scan constitute a clear misrepresentation of R.S.'s physical condition and injuries.

216.    On April 6, 2007, R.S. also received an MRI scan of the left knee at Right Aid.

217.    On or about April 6, 2007, Lyons analyzed R.S.'s scan and prepared a report on behalf of Right Aid.

218.    Lyons made the following written findings in his medical report: (1) posteromedial meniscal tear; (2) synovitis; and (3) bone islands.

219.    The MRI scan reveals a posterior horn tear as reported.

220.    The MRI scan further reveals an ACL tear that was not diagnosed by Lyons.

221.    None of the other findings made by Lyons exist on the MRI scan.

222.    The deficient nature of Lyons' report, combined with the fact that Lyons' report contains the same boilerplate language and findings found in the majority of Lyons' knee MRI reports, suggests he did not review R.S.'s MRI film prior to preparing the report.

223.    Lyons' findings concerning R.S.'s left knee MRI scan constitute a clear misrepresentation of R.S.'s physical condition and injuries.

224.    Thereafter, Right Aid submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly

provided to R.S.

225.     Allstate reasonably relied upon Right Aid's false medical documentation in paying No-Fault benefits to or on behalf of R.S. that were otherwise non-compensable under New York State law.

**J.     F.C. CLAIM**

226.     Allstate claimant F.C. (Claim No. 4735957278), claimed soft tissue injuries as a result of a motor vehicle accident.

227.     On September 3, 2007, F.C. received an MRI scan of the right knee at Right Aid.

228.     On or about September 3, 2007, Lyons analyzed F.C.'s scan and prepared a report on behalf of Right Aid.

229.     Lyons made the following written findings in his medical report: (1) posteromedial meniscal tear; (2) synovitis; and (3) mild degenerative meniscal changes.

230.     None of the findings made by Lyons exist on the MRI scan.

231.     Lyons' findings concerning F.C.'s right knee MRI scan constitute a clear misrepresentation of F.C.'s physical condition and injuries.

232.     Thereafter, Right Aid submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to F.C.

233.     Allstate reasonably relied upon Right Aid's false medical documentation in paying No-Fault benefits to or on behalf of F.C. that were otherwise non-compensable under New York State law.

**K.     L.F.R. CLAIM**

234.     Allstate claimant L.F.R. (Claim No. 0111696991), claimed soft tissue injuries as a

result of a motor vehicle accident.

235.    On August 15, 2008, L.F.R. received an MRI scan of the left knee at Right Aid.

236.    On or about August 15, 2008, Lyons analyzed L.F.R.'s scan and prepared a report on behalf of Right Aid.

237.    Lyons made the following written findings in his medical report: (1) posteromedial menisco-capsular tear; and (2) presence of joint fluid comparable with synovitis.

238.    None of the findings made by Lyons exist on the MRI scan.

239.    Lyons' findings concerning L.F.R.'s left knee MRI scan constitute a clear misrepresentation of L.F.R.'s physical condition and injuries.

240.    Thereafter, Right Aid submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to L.F.R.

241.    Allstate reasonably relied upon Right Aid's false medical documentation in paying No-Fault benefits to or on behalf of L.F.R. that were otherwise non-compensable under New York State law.

**L.      M.B. CLAIM**

242.    Allstate claimant M.B. (Claim No. 4145269801), claimed soft tissue injuries as a result of a motor vehicle accident.

243.    On November 2, 2007, M.B. received an MRI scan of the cervical spine at Right Aid.

244.    On or about November 2, 2007, Lyons analyzed M.B.'s scan and prepared a report on behalf of Right Aid.

245.    Lyons made the following written findings in his medical report: (1) C6-7 and

C7-T1 bulges with reparative osseous changes; (2) C3-4 central subligamentous herniation; (3) C4-5 and C5-6 annular tears; and (4) reversal of the normal lordotic curve with an associated levocurvature.

246.    None of the findings made by Lyons exist on the MRI scan.

247.    Lyons' findings concerning M.B.'s cervical spine MRI scan constitute a clear misrepresentation of M.B.'s physical condition and injuries.

248.    Thereafter, Right Aid submitted false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to M.B.

249.    Allstate reasonably relied upon Right Aid's false medical documentation in paying No-Fault benefits to or on behalf of M.B. that were otherwise non-compensable under New York State law.

**M.      P.R. CLAIM**

250.    Allstate claimant P.R. (Claim No. 4145269801), claimed soft tissue injuries as a result of a motor vehicle accident.

251.    On January 2, 2008, P.R. received an MRI scan of the right knee at Right Aid.

252.    On or about January 2, 2008, Lyons analyzed P.R.'s scan and prepared a report on behalf of Right Aid.

253.    Lyons made the following written findings in his medical report: (1) posteromedial meniscal tear; and (2) synovitis.

254.    None of the findings made by Lyons exist on the MRI scan.

255.    Lyons' findings concerning P.R.'s right knee MRI scan constitute a clear misrepresentation of P.R.'s physical condition and injuries.

256.     Thereafter, Right Aid submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to P.R.

257.     Allstate reasonably relied upon Right Aid's false medical documentation in paying No-Fault benefits to or on behalf of P.R. that were otherwise non-compensable under New York State law.

**N.      S.L. CLAIM**

258.     Allstate claimant S.L. (Claim No. 2126920236), claimed soft tissue injuries as a result of a motor vehicle accident.

259.     On January 17, 2008, S.L. received an MRI scan of the right knee at A Plus.

260.     On or about January 17, 2008, Lyons analyzed S.L.'s scan and prepared a report on behalf of A Plus.

261.     Lyons made the following written findings in his medical report: (1) posteromedial meniscal tear; and (2) synovitis.

262.     None of the findings made by Lyons exist on the MRI scan.

263.     Lyons' findings concerning S.L.'s right knee MRI scan constitute a clear misrepresentation of S.L.'s physical condition and injuries.

264.     Thereafter, A Plus submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to S.L.

265.     Allstate reasonably relied upon A Plus' false medical documentation in paying No-Fault benefits to or on behalf of S.L. that were otherwise non-compensable under New York State law.

O. **O.D. CLAIM**

266.     Allstate claimant O.D. (Claim No. 4816774204), claimed soft tissue injuries as a result of a motor vehicle accident.

267.     On December 5, 2007, O.D. received an MRI scan of the cervical spine at A Plus.

268.     On or about December 5, 2007, Lyons analyzed O.D.'s scan and prepared a report on behalf of A Plus.

269.     Lyons made the following written findings in his medical report: (1) C5-6 annular tear; (2) disc bulges at C5-6 and C6-7; and (3) straightening of the normal lordotic curve with an associated levocurvature.

270.     None of the findings made by Lyons exist on the MRI scan.

271.     Lyons' findings concerning O.D.'s cervical spine MRI scan constitute a clear misrepresentation of O.D.'s physical condition and injuries.

272.     On December 21, 2007, O.D. also received an MRI scan of the lumbar spine at A Plus.

273.     On or about December 21, 2007, Lyons analyzed O.D.'s scan and prepared a report on behalf of A Plus.

274.     Lyons made the following written findings in his medical report: (1) L5-S1 central herniation; (2) disc bulges at L2-3, L3-4, and L4-5; and (3) levocurvature.

275.     None of the findings made by Lyons exist on the MRI scan.

276.     However, the MRI scan does show L5-S1 disc desiccation.

277.     The deficient nature of Lyons' report, combined with the fact that Lyons did not diagnose a readily identifiable condition (i.e., L5-S1 disc desiccation), suggests he did not review O.D.'s MRI film prior to preparing the report.

278.    Lyons' findings concerning O.D.'s lumbar spine MRI scan constitute a clear misrepresentation of O.D.'s physical condition and injuries.

279.    Thereafter, A Plus submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to O.D.

280.    Allstate reasonably relied upon A Plus' false medical documentation in paying No-Fault benefits to or on behalf of O.D. that were otherwise non-compensable under New York State law.

P.    **B.I. Claim**

281.    Allstate claimant B.I. (Claim No. 0124536178), claimed soft tissue injuries as a result of a motor vehicle accident.

282.    On October 25, 2008, B.I. received an MRI scan of the right shoulder at Shore.

283.    On or about October 25, 2008, Lyons analyzed B.I.'s scan and prepared a report on behalf of Shore.

284.    Lyons made the following written findings in his medical report: fluid in the joint capsule with swelling of the conjoined tendon (comparable with tenosynovitis).

285.    None of the findings made by Lyons exist on the MRI scan.

286.    Lyons recommends further evaluation for tendon injury even though the MRI was intended to evaluate this condition.

287.    Lyons' findings concerning B.I.'s right shoulder MRI scan constitute a clear misrepresentation of B.I.'s physical condition and injuries, and Lyons' recommendation for additional evaluation supports the conclusion that Lyons' interpretation of B.I.'s right shoulder MRI scan was nothing more than a worthless service.

288.     Thereafter, Shore submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to B.I.

289.     Allstate reasonably relied upon Shore's false medical documentation in paying No-Fault benefits to or on behalf of B.I. that were otherwise non-compensable under New York State law.

290.     On December 13, 2008, B.I. also received an MRI scan of the lumbar spine at Atlantic Imaging.

291.     On or about December 13, 2008, Lyons analyzed B.I.'s scan and prepared a report on behalf of Atlantic Imaging.

292.     Lyons made the following written findings in his medical report: (1) L4-5 disc bulge; and (2) acceleration-deceleration muscular injury.

293.     None of the findings made by Lyons exist on the MRI scan.

294.     Lyons' finding of an acceleration-deceleration injury is a subjective and speculative finding that should not be contained in an objective radiologic report.

295.     Lyons' findings concerning B.I.'s lumbar spine MRI scan constitute a clear misrepresentation of B.I.'s physical condition and injuries.

296.     Thereafter, Atlantic Imaging submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to B.I.

297.     Allstate reasonably relied upon Atlantic Imaging's false medical documentation in paying No-Fault benefits to or on behalf of B.I. that were otherwise non-compensable under New York State law.

**Q.**     **N.D CLAIM**

298.     Allstate claimant N.D. (Claim No. 117384321-03), claimed soft tissue injuries as a result of a motor vehicle accident.

299.     On December 9, 2008, N.D. received an MRI scan of the right knee at Right Aid.

300.     On or about December 9, 2008, Lyons analyzed N.D.'s scan and prepared a report on behalf of Right Aid.

301.     Lyons made the following written findings in his medical report: (1) posteromedial meniscal tear; and (2) presence of joint fluid compatible with synovitis.

302.     None of the findings made by Lyons exist on the MRI scan.

303.     Lyons' findings concerning N.D.'s right knee MRI scan constitute a clear misrepresentation of N.D.'s physical condition and injuries.

304.     Thereafter, Right Aid submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to N.D.

305.     Allstate reasonably relied upon Right Aid's false medical documentation in paying No-Fault benefits to or on behalf of N.D. that were otherwise non-compensable under New York State law.

**R.**     **J.K. CLAIM**

306.     Allstate claimant J.K. (Claim No. 0114453871), claimed soft tissue injuries as a result of a motor vehicle accident.

307.     On August 25, 2008, J.K. received an MRI scan of the right shoulder at Right Aid.

308.     On or about August 25, 2008, Lyons analyzed J.K.'s scan and prepared a report

on behalf of Right Aid.

309.    Lyons made the following written findings in his medical report: (1) SLAP labral tear; and (2) fluid in the joint capsule with swelling of the conjoined tendon (compatible with tenosynovitis/bursitis).

310.    None of the findings made by Lyons exist on the MRI scan.

311.    Lyons recommends further evaluation for tendon injury even though the MRI was intended to evaluate this condition.

312.    Lyons' findings concerning J.K.'s right shoulder MRI scan constitute a clear misrepresentation of J.K.'s physical condition and injuries, and Lyons' recommendation for additional evaluation supports the conclusion that Lyons' interpretation of J.K.'s right shoulder MRI scan was nothing more than a worthless service.

313.    Thereafter, Right Aid submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to J.K.

314.    Allstate reasonably relied upon Right Aid's false medical documentation in paying No-Fault benefits to or on behalf of J.K. that were otherwise non-compensable under New York State law.

**S.      D.Co. Claim**

315.    Allstate claimant D.Co. (Claim No. 0141908202), claimed soft tissue injuries as a result of a motor vehicle accident.

316.    On August 14, 2009, D.Co. received an MRI scan of the lumbar spine at Right Aid.

317.    On or about August 14, 2009, Lyons analyzed D.Co.'s scan and prepared a report

on behalf of Right Aid.

318.    Lyons made the following written findings in his medical report: (1) L3-4 disc bulge with thecal sac impingement; (2) L4-5 disc bulge with thecal sac impingement; (3) L5-S1 disc bulge with thecal sac impingement.

319.    None of the findings made by Lyons exist on the MRI scan.

320.    Lyons' findings concerning D.Co.'s lumbar spine MRI scan constitute a clear misrepresentation of D.Co.'s physical condition and injuries.

321.    On June 29, 2009, D.Co. also received an MRI scan of the left shoulder at Right Aid.

322.    On or about June 29, 2009, Lyons analyzed D.Co.'s scan and prepared a report on behalf of Right Aid.

323.    Lyons made the following written findings in his medical report: (1) SLAP labral tear; and (2) fluid in the subdeltoid bursa and joint capsule with swelling of the conjoined tendon (compatible with tenosynovitis/bursitis).

324.    None of the findings made by Lyons exist on the MRI scan.

325.    Lyons' report omits any reference to an abnormality in the tendon substance.

326.    Lyons' findings concerning D.Co.'s left shoulder MRI scan constitute a clear misrepresentation of D.Co.'s physical condition and injuries, and Lyons' failure to identify conditions present on D.Co's MRI scan supports the conclusion that Lyons' interpretation of this MRI scan was nothing more than a worthless service.

327.    Thereafter, Right Aid submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to D.Co.

328.     Allstate reasonably relied upon Right Aid's false medical documentation in paying No-Fault benefits to or on behalf of D.Co. that were otherwise non-compensable under New York State law.

**T.      N.C. CLAIM**

329.     Allstate claimant N.C. (Claim No. 0134464353), claimed soft tissue injuries as a result of a motor vehicle accident.

330.     On April 17, 2009, N.C. received an MRI scan of the left knee at Shore.

331.     On or about April 17, 2009, Lyons analyzed N.C.'s scan and prepared a report on behalf of Shore.

332.     Lyons made the following written findings in his medical report: (1) posterolateral menisco-capsular tear; and (2) presence of joint fluid indicative of post traumatic synovitis.

333.     None of the findings made by Lyons exist on the MRI scan.

334.     Lyons' findings concerning N.C.'s left knee MRI scan constitute a clear misrepresentation of N.C.'s physical condition and injuries.

335.     Thereafter, Shore submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to N.C.

336.     Allstate reasonably relied upon Shore's false medical documentation in paying No-Fault benefits to or on behalf of N.C. that were otherwise non-compensable under New York State law.

**U.      W.I. CLAIM**

337.     Allstate claimant W.I. (Claim No. 4145467611), claimed soft tissue injuries as a

result of a motor vehicle accident.

338.    On June 30, 2008, W.I. received an MRI scan of the left shoulder at Omega.

339.    On or about June 30, 2008, Lyons analyzed W.I.'s scan and prepared a report on behalf of Omega.

340.    Lyons made the following written finding in his medical report: fluid in the joint capsule with swelling of the conjoined tendon (compatible with tenosynovitis/bursitis).

341.    This finding made by Lyons does not exist on the MRI scan.

342.    Lyons' finding concerning W.I.'s left shoulder MRI scan constitutes a clear misrepresentation of W.I.'s physical condition and injuries.

343.    Thereafter, Omega submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to W.I.

344.    Allstate reasonably relied upon Omega's false medical documentation in paying No-Fault benefits to or on behalf of W.I. that were otherwise non-compensable under New York State law.

**V.    A.D. CLAIM**

345.    Allstate claimant A.D. (Claim No. 0107518664), claimed soft tissue injuries as a result of a motor vehicle accident.

346.    On February 29, 2008, A.D. received an MRI scan of the right knee at Omega.

347.    On or about February 29, 2008, Lyons analyzed A.D.'s scan and prepared a report on behalf of Omega.

348.    Lyons made the following written findings in his medical report: (1) posteromedial meniscal tear; (2) presence of joint fluid compatible with synovitis; and (3) lateral

patellar subluxation.

349.    Despite Lyons' representations to the contrary, no posterior horn medial meniscal tear or lateral subluxation exist on the MRI scan.

350.    Notably, however, Lyons' report omits any reference to chonromalacia patella which is readily apparent on the film.

351.    Lyons' findings concerning A.D.'s right knee MRI scan constitute a clear misrepresentation of A.D.'s physical condition and injuries, and Lyons' failure to diagnose readily identifiable conditions supports the conclusion that Lyons' interpretation of A.D.'s right knee MRI scan was nothing more than a worthless service.

352.    Thereafter, Omega submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to A.D.

353.    Allstate reasonably relied upon Omega's false medical documentation in paying No-Fault benefits to or on behalf of A.D. that were otherwise non-compensable under New York State law.

**W.    M.P. CLAIM**

354.    Allstate claimant M.P. claimed soft tissue injuries as a result of a motor vehicle accident.

355.    On November 15, 2007, M.P. received an MRI scan of the lumbar spine at Right Aid.

356.    On or about November 15, 2007, Lyons analyzed M.P.'s scan and prepared a report on behalf of Right Aid.

357.    Lyons made the following written findings in his medical report: (1) L5-S1

annular tear with subligamentous herniation; (2) L3-4 disc bulge; (3) L4-5 disc bulge; and (4) dextrocurvature.

358.    Despite Lyons' representations to the contrary, no annular tear, L3-4 disc bulge, or dextrocurvature exist on the MRI scan.

359.    Lyons' findings concerning M.P.'s lumbar spine MRI scan constitute a clear misrepresentation of M.P.'s physical condition and injuries.

360.    Thereafter, Right Aid submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to M.P.

361.    Allstate reasonably relied upon Right Aid's false medical documentation in paying No-Fault benefits to or on behalf of M.P. that were otherwise non-compensable under New York State law.

## X.    A.H. CLAIM

362.    Allstate claimant A. H. claimed soft tissue injuries as a result of a motor vehicle accident.

363.    On February 1, 2007, A.H. received an MRI scan of the left shoulder at Right Aid.

364.    On or about February 1, 2007, Lyons analyzed A.H.'s scan and prepared a report on behalf of Right Aid.

365.    Lyons made the following written findings in his medical report: (1) tenosynovitis/bursitis; (2) AC joint arthrosis and malalignment with mild impingement; and (3) mild degenerative changes.

366.    None of the findings made by Lyons exist on the MRI scan.

367.     Lyons' findings concerning A.H.'s left shoulder MRI scan constitute a clear misrepresentation of A.H.'s physical condition and injuries.

368.     On February 9, 2007, A.H. also received an MRI scan of the cervical spine at Right Aid.

369.     On or about February 9, 2007, Lyons analyzed A.H.'s scan and prepared a report on behalf of Right Aid.

370.     Lyons made the following written findings in his medical report: (1) C5-6 subligamentous herniation; and (2) mild dextrocurvature.

371.     None of the findings made by Lyons exist on the MRI scan.

372.     Lyons' findings concerning A.H's cervical spine MRI scan constitute a clear misrepresentation of A.H.'s physical condition and injuries.

373.     Thereafter, Right Aid submitted Lyons' false medical documentation to Allstate through the U.S. Mail demanding payment for fraudulent medical treatment purportedly provided to A.H.

374.     Allstate reasonably relied upon Right Aid's false medical documentation in paying No-Fault benefits to or on behalf of A.H. that were otherwise non-compensable under New York State law.

## VI.     FACTUAL ALLEGATIONS REGARDING THE ILLEGAL CORPORATE PRACTICE OF MEDICINE

375.     As discussed below, the defendants, at all times relevant, knew that the PC Defendants were operating in violation of New York law, and were ineligible to pursue and collect No-Fault benefits because: (a) the PC Defendants were actually owned and controlled by persons not licensed to practice medicine; and (b) the PC Defendants were engaged in illegal fee-splitting with non-licensed laypersons.

41

376. The defendants implemented a massive fraud scheme through which they billed the New York automobile insurance industry millions of dollars through the PC Defendants, which were illegally owned and controlled by non-licensed laypersons and ineligible for No-Fault benefits.

377. The ownership and control of the PC Defendants by non-licensed laypersons compromised patient care, as the provision of health services by the PC Defendants was, at all relevant times, subject to the pecuniary interests of non-physicians as opposed to the exercise of independent medical judgment by a true doctor/owner.

378. Because the PC Defendants were: (a) fraudulently incorporated; (b) used as a conduit to illegally split fees with non-licensed laypersons; and (c) not owned or controlled by licensed medical physicians, they were ineligible to pursue and collect No-Fault benefits under New York law.

379. The defendants purposely created the PC Defendants with different names, addresses and taxpayer identification numbers to reduce the likelihood that the defendants' medical billing fraud scheme would be detected.

### A. NO-FAULT LAWS AND LICENSING STATUTES

380. Allstate underwrites automobile insurance in the State of New York.

381. New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services.

382. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. INS. LAW § 5101, *et seq.*), and the regulations promulgated pursuant thereto (11 NYCRR § 65, *et seq.*) (collectively "the No-Fault Laws"), automobile insurers are required to provide

Personal Injury Protection Benefits ("No-Fault benefits") to Allstate claimants.

383.   A patient can assign No-Fault benefits to healthcare providers.

384.   Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3").

385.   Pursuant to § 403(d) of the New York State Insurance Law, NF-3s must be verified by the healthcare provider subject to the following warning: "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime" (hereinafter referred to as the "NF-3 Verification").

386.   Pursuant to New York's No-Fault laws, fraudulently incorporated professional corporations are not eligible to receive No-Fault benefits.

387.   In New York, only a licensed medical doctor may: (a) practice medicine; (b) own and control a professional service corporation authorized to practice medicine; (c) employ and supervise other physicians; and (d) derive – absent statutory exceptions not applicable in this case – economic benefit from physician services.

388.   New York's No-Fault laws provide that "[a] provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 NYCRR §65-3.16(a)(12).

389.    New York Business Corporation Law § 1504 provides that no professional service corporation may render professional services except through individuals authorized by law to render such professional services as individuals.

390.    Section 1507 of the Business Corporation Law prohibits a professional service corporation from issuing shares to individuals unless they are "engaged in the practice of such profession in such a corporation." It also prohibits such shareholder(s) from entering into any agreement, granting proxies or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice.

391.    Pursuant to Section 1508 of the Business Corporation Law of New York, no individual may be a director or officer of a professional service corporation unless he is authorized by law to practice in this state a profession which such corporation is authorized to practice.

392.    In New York, insurers may seek affirmative recovery against individuals and entities that have violated the above statutes and regulations.

393.    In *State Farm v. Mallela,* 4 N.Y.3d 313 (2005), the New York Court of Appeals upheld 11 NYCRR §65-3.16(a)(12) holding that medical corporations that are fraudulently incorporated under New York Business Corporation Law §§1507 and 1508, and New York Education Law §6507(4)(c) are not entitled to reimbursement.

394.    In *Metroscan Imaging, P.C. v. GEICO,* 823 N.Y.S.2d 818, 821-822 (2006), it was held that an insurer may maintain a cause of action against a fraudulently incorporated medical provider to recover monies paid on or after April 5, 2002 (11 NYCRR 65-3.16(a)(12)'s effective date).

### B.   SPECIFIC EVIDENCE OF UNLAWFUL CORPORATE PRACTICE OF MEDICINE

395.    Each PC Defendant operated in a manner that evidenced its layperson ownership and control in direct violation of New York law.

#### 1.   WAGNER & ORACLE

396.    Wagner lacked knowledge concerning material aspects of Oracle's corporate affairs.

397.    In a sworn affidavit dated February 5, 2010, Wagner asserted that he was the sole shareholder of Oracle, and that he never authorized Lyons to provide any interpretation services on behalf of Oracle. *See* Affidavit of Ronald Wagner, M.D. dated February 5, 2010, annexed hereto as Exhibit 1. The contents of this affidavit are fully incorporated herein by reference.

398.    In another sworn affidavit dated February 22, 2010, Wagner affirmed that ALMA is Oracle's "management company." *See* Affidavit of Ronald Wagner, M.D. dated February 22, 2010, annexed hereto as Exhibit 2. The contents of this affidavit are fully incorporated herein by reference.

399.    Wagner claimed that: (a) Oracle dissolved on February 12, 2010; (b) Wagner did not know Babigian; (c) Wagner did not know DeNise; (d) Wagner never authorized anyone to prepare or use a signature stamp; and (e) Wagner never authorized anyone to conduct collection activity on behalf of Oracle. *See id.*

400.    In a third sworn affidavit dated March 12, 2010, Wagner stated as follows: "On February 5, 2010, I advised several parties of my status as the shareholder of [Oracle], a New York State professional corporation, when in fact I was no longer the shareholder of said P.C." *See* Affidavit of Ronald Wagner, M.D. dated March 12, 2010,[2] annexed hereto as Exhibit 3. The

---

[2] The affidavit is incorrectly dated March 12, 2009, but it is clear that it was executed on March 12, 2010.

contents of this affidavit are fully incorporated herein by reference.

401.    Wagner insisted that as of June 2009, the shares of Oracle were to be transferred to Babigian; however, Wagner later learned that the shares were not properly transferred. *See id.*

402.    Contrary to his earlier assertions in the February 22, 2010 affidavit, Wagner asserted: (a) that he performed all services related to the radiological diagnostic services provided by Oracle; (b) that he provided the office with a signature stamp and the authority to use it on dictated reports; and (c) that he authorized his staff to refer matters to third party collectors. *See id.*

403.    In a fourth sworn affidavit dated May 19, 2010, Wagner purportedly rescinded the February 5, 2010 and February 22, 2010 affidavits. *See* Affidavit of Ronald Wagner, M.D. dated May 19, 2010, annexed hereto as Exhibit 4.  The contents of this affidavit are fully incorporated herein by reference.

404.    Wagner further affirmed that Oracle ceased operations on June 20, 2009, and was formally dissolved on February 12, 2010. *See id.*

405.    In the May 19, 2010 Affidavit, Wagner claimed that he sold Oracle to Babigian (who he claimed not to know in the February 22, 2010 affidavit). *See id.*

406.    Further contradicting earlier affidavits, Wagner stated: (a) that he did maintain a signature stamp, and authorized his staff to use the stamp on dictated reports; and (b) that his staff was authorized to pursue collections activity on behalf of Oracle. *See id.*

407.    In a fifth affidavit dated September 29, 2010, Wagner claimed that ALMA is Oracle's "management company," but denied signing the May 19, 2010 affidavit. *See* Affidavit of Ronald Wagner, M.D. dated September 29, 2010, annexed hereto as Exhibit 5.  The contents of this affidavit are fully incorporated herein by reference.

408.    In the September 29, 2010 affidavit, Wagner once again claimed that he did not know Babigian, and claimed that he did not sign a purchase and sale agreement transferring ownership of Oracle to Babigian.  *See id.*

409.    Wagner's contradictory statements, combined with his inability to explain Oracle's basic business practices, demonstrate that Wagner did not control Oracle's business affairs.

410.    Wagner repeatedly affirmed, however, that ALMA was Oracle's "management company."

411.    At all relevant times, and in violation of New York law, Wagner followed the directives ordered by Oracle's layperson owners, and Wagner was subordinate to the non-licensed person(s) who actually controlled and operated Oracle.

> 2.    BABIGIAN & ORACLE

412.    In February of 2010, Babigian was recruited by Bogoraz to replace Wagner as Oracle's nominal owner.

413.    Babigian claimed he received a call from "Arthur Goldstein," after Babigian posted his resume on a radiologist trade website.

414.    According to Babigian, "Arthur Goldstein" was an alias used by Bogoraz.

415.    Bogoraz is currently a defendant in at least two civil lawsuits pending in this District.  Each of these matters pertains to the fraudulent incorporation and layperson ownership and control of medical professional service companies in violation of New York law.  *See, e.g., Government Employees Ins. Co., et al. v. Damien, et al.*, United States District Court for the Eastern District of New York, Docket No. 1:10-cv-05409-SLT-JMA; *Allstate Ins. Co., et al. v. Bogoraz, et al.*, United States District Court for the Eastern District of New York, Case No. 2:10-

cv-05286-SJF-ETB. Bogoraz was also a defendant in a criminal indictment alleging insurance fraud. *See People v. Fratta, et al.*, Supreme Court of the State of New York, County of Queens, Indictment No. 708/2004.

416.    Babigian and Bogoraz reached an agreement where Oracle's ownership would be transferred from Wagner to Babigian.

417.    During negotiations, Babigian contacted Bogoraz and demanded additional payment because "this situation [assumption of ownership of Oracle] is worth more than [$10,000.00]. *See* e-mail between Babigian and Bogoraz dated March 21, 2010, annexed hereto as Exhibit 6. The contents of this e-mail are fully incorporated herein by reference.

418.    Thereafter, Babigian purportedly acquired an ownership interest in Oracle, replacing Wagner as Oracle's nominal owner.

419.    Upon information and belief, Babigian was paid in excess of $10,000.00 to become the nominal owner of Oracle.

420.    After this transaction, Oracle continued to be owned, operated, and controlled by ALMA, Golub and Bogoraz in violation of New York law.

>            3.      KALIKA & RIGHT AID

421.    Kalika submitted to an interview on October 14, 2010.

422.    Kalika is the purported "paper owner" of Right Aid.

423.    Kalika had no knowledge concerning material aspects of the business operations of Right Aid, even though she is listed as the sole officer, director and shareholder.

424.    Kalika claimed that Right Aid contracted with Lyons to analyze and interpret MRI studies performed at Right Aid.

425.    However, Kalika has never met Lyons.

426.   Despite maintaining this contractual relationship, Kalika did not know Lyons' first name.

427.   To date, Right Aid has produced hundreds of separate MRI reports purportedly authored and executed by Lyons using a signature stamp that clearly reads "John S. Lyons, M.D," and containing a type-written replication immediately below the stamped signature.  A sample MRI report drafted by Lyons on behalf of Right Aid is annexed herewith as Exhibit 7.

428.   Kalika's inability to identify Lyons supports the conclusion that she is nothing more than a "doc-in-the-box."  As a "doc-in-the-box," Kalika serves as an owner of Right Aid in name only, and has ceded control of her name and her medical license to a management company controlled by non-licensed laypersons.

429.   As Right Aid's purported treating physician, Kalika should have reviewed every MRI report generated on behalf of Right Aid patients.

430.   When billing Allstate for Lyons' services, Right Aid's NF-3 Forms routinely listed Kalika as the "treating physician," and did not disclose Right Aid's relationship with Lyons.

431.   By signing and submitting these NF-3 Forms, Kalika represented that she was the treating physician and maintained exclusive control over patient care.

432.   If Lyons performs medical services on behalf of Right Aid, he must be disclosed on the NF-3 Form.

433.   Right Aid intentionally concealed its relationship with Lyons on the NF-3 Form.

434.   In doing so, Right Aid intentionally misrepresented the medical treatment provided to Allstate claimants.

435.   After admitting she never met Lyons and having extreme difficulty identifying

Lyons, Kalika refused to answer further questions concerning Right Aid.

        4.     ATLANTIC IMAGING AND ATLANTIC RADIOLOGY

        a.     Atlantic Imaging Succeeds Atlantic Radiology

436.    Atlantic Radiology is the predecessor to Atlantic Imaging.

437.    There are only two differences between the two PCs: the minor name change from Atlantic Radiology P.C. to Atlantic Radiology Imaging P.C., and the change in nominal ownership from McCarthy and Stern.

438.    Both PCs list their registered addresses as 105 Kings Highway, Brooklyn, NY.

439.    Both PCs have similar corporate names.

440.    Both PCs have similar logos. *Compare* Exhibit 8 (sample Atlantic Radiology MRI Report) *with* Exhibit 9 (printout of http://www.atlanticrad.com, accessed on April 25, 2011). The contents of both exhibits are fully incorporated herein by reference.

441.    Both PCs used the website (http://www.atlanticrad.com).

442.    Both PCs retained the services of Lyons to read MRI reports on behalf of the PC.

443.    Stern claimed "Lyons came with the furniture" – i.e., Lyons analyzed MRI scans for McCarthy at Atlantic Radiology, and Stern was instructed by "management" to continue to use Lyons at Atlantic Imaging.

444.    In violation of New York law, both PCs were actually operated and controlled by the same layperson owners (Korenblit, Atbayshan and Zharov).

        b.     Stern Admitted That Atlantic Imaging is Operated and Controlled by Korenblit, Atbayshan and Zharov

445.    Stern was interviewed on October 28, 2010 and February 3, 2011.

446.    Stern admitted that he was the "PC name owner" of Atlantic Imaging.

447.    Stern admitted he was under "management's" control, but he initially refused to

identify the managers.

448.    Stern vaguely referred to the managers as "management" or "they."

449.    During a follow up interview, Stern identified the three managers as Korenblit, Atbayshan and Zharov.  *See* Questionnaire dated February 3, 2011, annexed hereto as Exhibit 10. The contents of this questionnaire are fully incorporated herein by reference.

c.      <u>Atlantic Imaging's Management Controlled All Aspects of the Business</u>

450.    Stern admitted that Lyons was hired to read MRI films on behalf of Atlantic Imaging.

451.    However, Stern had no knowledge regarding Lyons' compensation, and did not know if Lyons was an employee or an independent contractor.

452.    Stern was unable to identify Lyons, and admitted that he only met Lyons once, approximately 15 years ago.

453.    Stern could not identify Atlantic Imaging's landlord.  *See* Exhibit 10.

454.    Stern did not know the type of equipment Atlantic Imaging leases.  *See id.*

455.    Stern admitted that he was an absentee "owner," and interacts with Atlantic Imaging's employees only by telephone.  *See id.*

456.    Stern admitted that he did not hire a management company; rather, the management company approached him.  *See id.*

457.    Specifically, Stern was sought out to act as a "doc-in-the-box" (i.e., nominal paper ownership of the PC), not for his radiologic expertise.

458.    Stern admitted that the management company collected and deposited payments received on behalf of Atlantic Imaging.  *See id.*

459.    Stern admitted that the managers have a signature stamp they can use to sign

checks on behalf of Atlantic Imaging. *See id.*

460.    Stern admitted that he did not invest any money in Atlantic Imaging. *See id.*

461.    Stern could not identify the law firms or attorneys that are retained to pursue collections on behalf of Atlantic Imaging. *See id.*

462.    Stern could not meaningfully discuss how legal settlements or arbitration awards are allocated. *See id.*

463.    Stern could not identify Atlantic Imaging's accountants. *See id.*

464.    Stern's admissions evidence Stern's participation in a "doc-in-the-box" scheme, where Atlantic Imaging is operated and controlled by a management company and its non-licensed layperson owners, Korenblit, Atbayshan and Zharov.

d.      Stern Becomes Paper Owner of Atlantic

465.    Stern believed he was taking over the "Atlantic" practice from McCarthy in 2007.

466.    Stern took over after Atlantic's "managers" sought him out to succeed McCarthy's nominal ownership.

467.    Stern admitted he acquired personnel, furniture, equipment, and office space from Atlantic Radiology.

468.    Thereafter, Atlantic Radiology's licensure with the New York Department of Education, Office of the Professions lapsed, and as of December 31, 2008, Atlantic Radiology has not been authorized to lawfully conduct business as a professional medical corporation in the State of New York.

469.    With its predecessor (Atlantic Radiology) now defunct, Atlantic Imaging was also able to acquire the rights to Atlantic Radiology's website (http://www.atlanticrad.com).

470.    Although both PCs list 105 Kings Highway, Brooklyn, NY as their registered

address, Atlantic Imaging is presently operating out of this address.

e.    Atlantic Radiology Controlled by Laypersons

471.    As discussed above, Stern admitted that Korenblit, Atbayshan and Zharov are the layperson owners of Atlantic Imaging.

472.    Korenblit, Atbayshan and Zharov were similarly the layperson owners of Atlantic Radiology.

473.    Atbayshan reported to the Rudy Giuliani Presidential Committee, Inc. that he was the manager of Atlantic Radiology, P.C. *See* Federal Elections Commission, Form 3P, Schedule A, annexed herewith as Exhibit 11.  The contents of this exhibit are fully incorporated herein by reference.

474.    Korenblit also reported he "managed" Atlantic Radiology.

475.    On August 9, 2006, before Atlantic Imaging came into existence, Atlantic Radiology obtained the rights to the internet domain (http://www.atlanticrad.com).

476.    Atlantic Radiology referred to the domain (http://www.atlanticrad.com) on the MRI reports it submitted to Allstate. *See* Exhibit 8.

477.    According to its internet domain history, the registrant of this domain was Korenblit and Atlantic Radiology. *See* Domain History for http://www.atlanticrad.com, annexed hereto as Exhibit 12.  The contents of this exhibit are fully incorporated herein by reference.

478.    Korenblit listed himself as the administrative and technical contact for Atlantic Radiology. *See id.*

479.    Based on these admissions, and the other similarities between Atlantic Radiology and Atlantic Imaging, both entities were owned and controlled by Korenblit, Atbayshan, and Zharov, in violation of New York law.

480.     Therefore, at all relevant times, Atlantic Radiology was ineligible to collect No-Fault payments from Allstate.

f.      Atlantic Radiology Continues to Bill Allstate

481.     Atlantic Radiology is no longer an active professional corporation.

482.     Atlantic Radiology, therefore, has no legitimate or lawful reason to continue to perform medical professional services and/or to bill Allstate.

483.     Nevertheless, Atlantic Radiology continues to bill Allstate for No-Fault payments in violation of New York law.

5.      DeNise & Aurora

484.     DeNise is the purported paper owner of Aurora – a PC initially incorporated and owned by Lyons.

485.     At some point during DeNise's ownership, DeNise attempted to distance himself from Aurora's management company's decisions.

486.     For example, on April 14, 2010, DeNise submitted a letter to "All Insurers" confirming that he was the nominal owner of Aurora (as well as two other PCs not named herein).  The letter instructed the insurers not to process or pay any bills that are pending from Aurora. *See* Letter from Counsel, annexed hereto as Exhibit 13.  The contents of this letter are fully incorporated herein by reference.

487.     On January 4, 2011 and January 6, 2011, Allstate requested an interview with DeNise to discuss this letter and DeNise's ownership interest in Aurora.  DeNise refused to speak with Allstate.

488.     Aurora operated in a manner consistent with the other "doc-in-the-box" PCs discussed above.

489.    Aurora has the same address as Oracle and A Plus.

490.    Like the other nominal owners, DeNise's April 14, 2010 letter indicated that he has no knowledge of Aurora's corporate affairs.

491.    DeNise is also listed as the nominal owner of two other PCs (i.e., Vital Radiology, P.C. and Essential Radiology, P.C.) – both of which attempted to collect No-Fault benefits from Allstate without his knowledge or consent. *See id.*

492.    Because Aurora was, at all relevant times, owned and controlled in violation of New York law, Aurora was not eligible to collect No-Fault payments from Allstate.

6.    CONCEALMENT OF UNLAWFUL CORPORATE STRUCTURE BY OTHER PC DEFENDANTS

493.    Shore, Omega and A Plus are nominally owned by Burshteyn.

494.    Burshteyn has refused to provide any information regarding the corporate structure of these PCs.

495.    Burshteyn referred all questions to a woman named "Anna."

496.    At all relevant times, "Anna" worked out of an apartment complex across the street from Burshteyn's PCs.

497.    "Anna" also refused to provide information regarding these PCs and referred all questions back to Burshteyn.

498.    To date, Burshteyn has refused to provide any information regarding these PCs.

499.    The foregoing demonstrates defendants' efforts to conceal the true ownership and control of the PCs.

500.    Despite having a legal obligation to do so, Burshteyn and A Plus have refused to cooperate with Allstate's investigation and have failed to appear at an Examination Under Oath ("EUO") aimed at investigating (1) the treatment of Allstate claimants, (2) A Plus' relationship

with Lyons, and (3) the PC's true ownership. *See Argento v. Aetna Casualty & Surety Co.*, 184 A.D.2d 487, 488 (N.Y. App. Div. 2d Dep't 1992).

501.    Notwithstanding Burshteyn and A Plus' intentional non-cooperation, all of Burshteyn's PCs – like the remaining PC Defendants – produce MRI reports that are purportedly analyzed and reviewed by Lyons.

502.    All employees, agents, and/or principals of the Burshteyn PCs refuse to discuss the PCs' corporate structure, including but not limited to (1) the PC's relationship with Lyons, and (2) the identity of the individuals and/or entities that exert actual control over the PC's business affairs.

503.    Omega is the successor to Shore.

504.    Upon changing names, Omega remained at the same facility as Shore and continued to be nominally owned by Burshteyn.

505.    There is no legitimate business purpose in re-incorporating under a different corporate name other than to further conceal the illegal ownership and operation of Omega.

7.    LAY-OWNED MEDICAL CLINICS CONSPIRED WITH LYONS

506.    Each PC Defendant conspired with Lyons.

507.    Each PC either employed Lyons, or retained Lyons as an independent contractor.

508.    Lyons was retained by each PC to analyze and review MRI reports on behalf of the PC.

509.    Lyons was retained despite each PC purportedly being owned by a medical professional that was licensed to perform these services on their own.

510.    Lyons' retention allowed the PCs to produce hundreds of fraudulent MRI reports.

511.    In some instances, Lyons was not listed as the "treating provider" on the NF-3

Forms submitted to Allstate.

512. To prevent fraud, the NF-3 Form requires a PC to disclose the name of the treating physician, if the treating physician is different than the billing provider.

513. In such cases, the treating provider is further required to disclose whether the treating physician is an employee or an independent contractor.

514. This distinction is important because a PC is ineligible to demand and collect No-Fault benefits if the medical treatment was provided by an independent contractor.

515. A PC is also ineligible to demand and collect No-Fault benefits if a lay-owned corporation employs Lyons.

516. The PC's failure to list Lyons, therefore, is meant to conceal Lyons' involvement in the fraudulent enterprise.

517. In those cases where Lyons' participation was not adequately disclosed, the PC was not eligible to demand and collect No-Fault benefits.

## VII.  SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

518. The defendants created, prepared and submitted false medical documentation and intentionally violated the laws of the United States by devising and intending to devise schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing or causing to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. §1341 (mail fraud) for the purpose of executing such fraudulent schemes and attempting to do so.

519. Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, NF-3 Forms, medical diagnoses, CPT Code tally sheets, referrals, letters

and request for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

520.    Every automobile insurance claim detailed within involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

521.    The defendants either personally used the mails to further their fraudulent scheme by causing medical bills and records from illegal clinics to be mailed to Allstate and/or counsel for claimants, and/or acted with knowledge that the use of the mails would follow in the ordinary course of business.

522.    The defendants fraudulently reported that the clinics were legitimately organized pursuant to the laws of the state of New York law.

523.    The defendants also fraudulently represented that medical treatment purportedly provided by the PC Defendants was medically necessary and compensable under New York Insurance laws.

524.    The defendants knew that their offices, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider or the plaintiff would use the mails in connection with each of the fraudulent claims, including issuing payments based upon defendants' fraudulent documentation.

525.    Allstate estimates that the defendants' fraudulent medical billing scheme generated hundreds of mailings.  A table highlighting selected examples of mail fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 14.

## VIII.   **ALLSTATE'S JUSTIFIABLE RELIANCE**

526.   Through the submission of medical records, including NF-3 forms, the defendants certified and represented to Allstate that the PC Defendants provided compensable medical treatment, and were incorporated, owned and operated in compliance with New York law.

527.   As licensed medical professionals, the individual physician defendants were obligated – legally and ethically – to act with honesty, integrity, and in accordance with their professional oath and pledge.

528.   At all relevant times, the defendants actively concealed from Allstate facts regarding the fabricated MRI reports and the PC Defendants' ownership to prevent Allstate from discovering that the PC Defendants were ineligible to demand or collect No-Fault benefits.

529.   In each bill that the defendants submitted or caused to be submitted, the defendants uniformly misrepresented that the PC Defendants were actually performing compensable medical services, and were properly incorporated, lawfully licensed, and eligible to demand or collect No-Fault benefits.

530.   Each claim submitted to Allstate by the PC Defendants was verified pursuant to Insurance Law §403.

531.    At the time the PC Defendants submitted patient invoices for payment, Allstate reasonably believed that the actions of the defendants conformed to all applicable laws, and that each defendant was bound by his or her avowed ethical obligations.

532.   To induce Allstate to promptly pay the fraudulently incorporated PC Defendants' patient invoices, defendants submitted – or caused to be submitted – to Allstate NF-3 forms which represented that the treatment was legitimate, and that the PC Defendants were owned and controlled by licensed medical professionals in compliance with New York law.

533.     Allstate is required, under statutory and contractual obligations, to promptly and fairly process claims within 30 days.

534.     The facially valid documents submitted to Allstate in support of the charges at issue – combined with the material misrepresentations described above – were designed to – and, in fact, did – induce Allstate to rely on the accuracy of such documents.

535.     In reliance on the representations of the defendants, Allstate paid money to these illegally organized entities to its detriment – monies that Allstate otherwise would not have paid if the defendants had provided true and accurate information.

536.     Based upon the defendants' concerted affirmative acts of concealment, Allstate did not discover, and could not reasonably have discovered, that its damages were attributable to the defendants' fraud until shortly before it filed this Complaint.

## IX.    **DAMAGES**

537.     The defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law.  Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments in connection with No-Fault claims of $4,739,572.76, the exact amount to be determined at trial.  The tables annexed hereto at Exhibits 15-21 and incorporated herein as if set forth in their entirety, identify Allstate's payments to defendants in connection with No-Fault claims determined to be fraudulent as of the filing of this Complaint.  Exhibit 15 identifies payments made to Right Aid.  Exhibit 16 identifies payments made to A Plus.  Exhibit 17 identifies payments made to Omega and Shore.  Exhibit 18 identifies payments made to Oracle.  Exhibit 19 identifies payments made to Atlantic Imaging.  Exhibit 20 identifies

payments made to Atlantic Radiology.  Exhibit 21 identifies payments made to Aurora.

## X.    CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. §1962(c)
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (Against John Lyons, M.D. and Sanna Kalika, M.D.)

538.    Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

539.    In connection with each of the claims identified in plaintiffs' Complaint, Lyons and Kalika ("Count I Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

540.    The Count I Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 14.

541.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

542.    Policies of insurance were delivered to insureds through the U.S. Mail.

543.    Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

544.    As documented above, the Count I Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Right Aid, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York

No-Fault laws.

545.     As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Right Aid, for the benefit of the Count I Defendants, that would not otherwise have been paid.

546.     The Count I Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

547.     The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

548.     By filing numerous fraudulent claims in an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

549.     The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Right Aid, for the benefit of the Count I Defendants.

550.     Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

551.     Right Aid Diagnostic Medicine P.C. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

552.     The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

553.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

554.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

555.    By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATIONS OF 18 U.S.C. §1962(c)
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (Against John Lyons, M.D. and Ilya Burshteyn, M.D.)

556.    Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

557.    In connection with each of the claims identified in plaintiffs' Complaint, Lyons and Burshteyn ("Count II Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

558.    The Count II Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 14.

559.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

560.    Policies of insurance were delivered to insureds through the U.S. Mail.

63

561. Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

562. As documented above, the Count II Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at A Plus, to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

563. As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to A Plus, for the benefit of the Count II Defendants, that would not otherwise have been paid.

564. The Count II Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

565. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

566. By filing numerous fraudulent claims in an ongoing scheme, the Count II Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

567. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to A Plus, for the benefit of the Count II Defendants.

568. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect

insurance rates.

569.    A Plus Medical P.C. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

570.    The Count II Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

571.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count II Defendants' conduct.

572.    The Count II Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

573.    By virtue of the Count II Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT III
### VIOLATIONS OF 18 U.S.C. §1962(c)
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (Against John Lyons, M.D. and Ilya Burshteyn, M.D.)

574.    Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

575.    In connection with each of the claims identified in plaintiffs' Complaint, Lyons and Burshteyn ("Count III Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

576.    The Count III Defendants employed one or more mailings to demand and/or

receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 14.

577.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

578.    Policies of insurance were delivered to insureds through the U.S. Mail.

579.    Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

580.    As documented above, the Count III Defendants repeatedly and intentionally prepared and submitted NF-3 forms, and other medical documentation, to Allstate for medical expenses and/or services that were purportedly performed at Omega to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

581.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Omega for the benefit of the Count III Defendants, which would not otherwise have been paid.

582.    The Count III Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

583.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

584.    By filing numerous fraudulent claims in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C.

§1962(c).

585.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Omega for the benefit of the Count III Defendants.

586.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

587.    Omega Medical Diagnostic, P.C. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

588.    The Count III Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

589.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

590.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

591.    By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. §1962(c)**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**(Against John Lyons, M.D. and Ilya Burshteyn, M.D.)**

592.    Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth

above as if fully set forth herein.

593.    In connection with each of the claims identified in plaintiffs' Complaint, Lyons and Burshteyn ("Count IV Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

594.    The Count IV Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 14.

595.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

596.    Policies of insurance were delivered to insureds through the U.S. Mail.

597.    Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

598.    As documented above, the Count IV Defendants repeatedly and intentionally prepared and submitted NF-3 forms, and other medical documentation, to Allstate for medical expenses and/or services that were purportedly performed at Shore to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

599.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Shore for the benefit of the Count IV Defendants, which would not otherwise have been paid.

600.    The Count IV Defendants' pattern of fraudulent claims, each appearing legitimate

on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

601.　The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

602.　By filing numerous fraudulent claims in an ongoing scheme, the Count IV Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

603.　The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Shore for the benefit of the Count IV Defendants.

604.　Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

605.　Shore Medical Diagnostic, P.C. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

606.　The Count IV Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

607.　Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IV Defendants' conduct.

608.　The Count IV Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

609.　By virtue of the Count IV Defendants' violations of 18 U.S.C. § 1962(c), Allstate

is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATIONS OF 18 U.S.C. §1962(c)**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**(Against John Lyons, M.D.; Arthur Bogoraz; David Golub;**
**and ALMA Building, LLC)**

610.     Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

611.     In connection with each of the claims identified in plaintiffs' Complaint, Lyons, Bogoraz, Golub and ALMA ("Count V Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

612.     The Count V Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 14.

613.     Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

614.     Policies of insurance were delivered to insureds through the U.S. Mail.

615.     Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

616.     As documented above, the Count V Defendants repeatedly and intentionally prepared and submitted NF-3 forms, and other medical documentation, to Allstate for medical

expenses and/or services that were purportedly performed at Oracle to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

617.     As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Oracle, for the benefit of the Count V Defendants, that would not otherwise have been paid.

618.     The Count V Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

619.     The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

620.     By filing numerous fraudulent claims in an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

621.     The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Oracle, for the benefit of the Count V Defendants.

622.     Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

623.     Oracle Radiology of NY P.C. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

624.     The Count V Defendants associated with the foregoing enterprise, and

participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

625.     Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' conduct.

626.     The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

627.     By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATIONS OF 18 U.S.C. §1962(c)**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**(Against John Lyons, M.D.; Harvey Stern, M.D.; Simon Korenblit;**
**Edward Atbayshan; and Alexander Zharov)**

628.     Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

629.     In connection with each of the claims identified in plaintiffs' Complaint, Lyons, Stern, Korenblit, Atbayshan and Zharov ("Count VI Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

630.     The Count VI Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 14.

631.     Among other things, NF-3 forms, medical billing invoices, medical reports,

applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

632.     Policies of insurance were delivered to insureds through the U.S. Mail.

633.     Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

634.     As documented above, the Count VI Defendants repeatedly and intentionally prepared and submitted NF-3 forms, and other medical documentation, to Allstate for medical expenses and/or services that were purportedly performed at Atlantic Imaging to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

635.     As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Atlantic Imaging, for the benefit of the Count VI Defendants, that would not otherwise have been paid.

636.     The Count VI Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

637.     The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

638.     By filing numerous fraudulent claims in an ongoing scheme, the Count VI Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

639.     The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Atlantic Imaging, for the benefit of the Count VI Defendants.

640.     Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

641.     Atlantic Radiology Imaging P.C. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

642.     The Count VI Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

643.     Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VI Defendants' conduct.

644.     The Count VI Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

645.     By virtue of the Count VI Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT VII
### VIOLATIONS OF 18 U.S.C. §1962(c)
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (Against John Lyons, M.D.; Joseph McCarthy, M.D.; Simon Korenblit; Edward Atbayshan; and Alexander Zharov)

646.     Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

647.     In connection with each of the claims identified in plaintiffs' Complaint, Lyons,

McCarthy, Korenblit, Atbayshan and Zharov ("Count VII Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

648.   The Count VII Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 14.

649.   Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

650.   Policies of insurance were delivered to insureds through the U.S. Mail.

651.   Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

652.   As documented above, the Count VII Defendants repeatedly and intentionally prepared and submitted NF-3 forms, and other medical documentation, to Allstate for medical expenses and/or services that were purportedly performed at Atlantic Radiology to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

653.   As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Atlantic Radiology, for the benefit of the Count VII Defendants, that would not otherwise have been paid.

654.   The Count VII Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

655. The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

656. By filing numerous fraudulent claims in an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

657. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Atlantic Imaging, for the benefit of the Count VII Defendants.

658. Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

659. Atlantic Radiology P.C. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

660. The Count VII Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

661. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII Defendants' conduct.

662. The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

663. By virtue of the Count VII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit,

including reasonable attorney's fees.

## COUNT VIII
### VIOLATIONS OF 18 U.S.C. §1962(c)
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
#### (Against John Lyons, M.D. and Richard DeNise, M.D.)

664.    Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

665.    In connection with each of the claims identified in plaintiffs' Complaint, Lyons and DeNise ("Count VIII Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

666.    The Count VIII Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 14.

667.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

668.    Policies of insurance were delivered to insureds through the U.S. Mail.

669.    Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

670.    As documented above, the Count VII Defendants repeatedly and intentionally prepared and submitted NF-3 forms, and other medical documentation, to Allstate for medical expenses and/or services that were purportedly performed at Aurora to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

671.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Aurora, for the benefit of the Count VIII Defendants, that would not otherwise have been paid.

672.    The Count VIII Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

673.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. §1341 (mail fraud).

674.    By filing numerous fraudulent claims in an ongoing scheme, the Count VIII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

675.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Aurora, for the benefit of the Count VIII Defendants.

676.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

677.    Aurora Radiology P.C. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

678.    The Count VIII Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

679.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or

property by reason of the Count VIII Defendants' conduct.

680.   The Count VIII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

681.   By virtue of the Count VIII Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
## CONSPIRACY UNDER 18 U.S.C. § 1962(d)
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (Against All Defendants)

682.   Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

683.   The defendants conspired with one another to violate 18 U.S.C. § 1962(c), and thereby violated 18 U.S.C. § 1962(d).

684.   As a result of this conspiratorial conduct, Allstate has been injured in its business and property.

685.   By virtue of the defendants' violations of 18 U.S.C. § 1962(d), Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
## COMMON LAW FRAUD
### (Against All Defendants)

686.   Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

687.    The defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect No-Fault benefits under New York law.

688.    The misrepresentations of fact by the defendants included, but were not limited to, the material misrepresentations of fact made in defendants' NF-3 forms, medical reports, invoices and collection documentation.

689.    The defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

690.    The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate by submitting claims for unnecessary medical treatment including the provision of MRI scans which were never read or analyzed.

691.    The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate by submitting claims from fraudulently incorporated medical clinics for No-Fault insurance benefits.

692.    The defendants' misrepresentations were known to be false and were made for the purposes of inducing Allstate to make payments for claims that were not legitimate.

693.    Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous, unreasonable, unnecessary, inappropriate, non-meritorious bills for medical expenses pursuant to no-fault insurance claims.

694.    Allstate's damages include, but are not limited to:

   a.    Monies paid in connection with the provision of bogus MRI studies as detailed in Section IV and V, *supra*;

   b.    Monies paid to professional service corporations owned and operated in direct violation of New York law; and

c.   Reimbursement for the fair and reasonable value of the labor and resources expended to detect and expose the defendants' scheme to defraud Allstate.

## COUNT XI
### VIOLATIONS OF N.Y. GEN. BUS. LAW § 349
### CONSUMER PROTECTION FROM DECEPTIVE ACTS AND PRACTICES
#### (Against All Defendants)

695.   Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

696.   The actions of defendants constitute violations of New York General Business Law §349.

697.   Each separate NF-3 form, bill, medical record and report submitted to Allstate constitutes separate violations of General Business Law §349.

698.   The defendants' deceptive acts were committed knowingly and maliciously with intent to deceive Allstate and the public.

699.   The defendants knew that their representations and/or omissions (or the representations/omissions they were facilitating), were deceptive and that they would be relied upon by Allstate.  Such representations included that (1) the defendants were actually providing legitimate MRI studies to its patients/Allstate claimants; (2) the PC Defendants were properly owned and operated in accordance with New York law, and (3) a duly licensed medical professional was the sole director, officer and/or shareholder each PC Defendant.

700.   The defendants' false claims were deceptive and misleading, and were relied upon by plaintiffs in making their claim payments to the PC Defendants.

701.   Allstate has been damaged by defendants' actions in that Allstate made substantial claim payments to the PC Defendants.

702.   Allstate is thus entitled to recover from defendants the payments they made to the

defendants.  Allstate hereby requests the return of these payments from the defendants, plus interest and attorneys' fees.

703.    At all relevant times, defendants engaged in materially deceptive practices and representations designed to, and which did, mislead the plaintiffs and consumer patients into reasonably, though falsely, believing that the PC Defendants are legitimate health services providers whose services were actually and necessarily rendered.

704.    Allstate justifiably relied upon defendants' deceptive acts, practices and representations in paying bills submitted by the defendants.  Defendants' fraudulent scheme was undertaken in the conduct of their business and in the furnishing of services in the State of New York, in violation of New York Gen. Bus. Law § 349(d), *et. seq.*

705.    The defendants' materially deceptive acts and practices have: (1) damaged Allstate by inducing it to pay over $4,739,572.76 to fraudulently incorporated and operated PCs; (2) harmed consumers by causing an escalation in insurance premiums and requiring that insured consumers pay for health services that were not covered by insurance because of defendants' fraud; and (3) harmed the public interest in general by placing in jeopardy the physical health and well-being of anyone who seeks care from the PC Defendants, for defendants are not in the business of treating and healing patients, but are in the business of stealing insurance proceeds.

706.    By reason of the foregoing, Allstate has been damaged and injured in its business and property.  Exhibits 15 through 21 (annexed hereto) identify all monies paid by Allstate to defendants since April 5, 2002.  Allstate is also entitled to an award of interest and reasonably attorneys' fees pursuant to Section 349(h) of the New York General Business Law.

## COUNT XII
### UNJUST ENRICHMENT
### (Against All Defendants)

707.     Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

708.     When Allstate paid the PC Defendants, it reasonably believed that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations and omissions.

709.     Allstate's payments constitute a benefit which the defendants aggressively sought and voluntarily accepted.

710.     The defendants caused the PC Defendants to wrongfully obtain payments from Allstate through their fraudulent billing scheme as described more fully in the paragraphs above.

711.     Retention of those benefits would violate fundamental principles of justice, equity and good conscience.

## COUNT XIII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### DECLARATORY JUDGMENT ACT
### (Against Right Aid Diagnostic Medicine P.C.; A Plus Medical P.C.;
### Omega Medical Diagnostic, P.C.; Shore Medical Diagnostic, P.C.;
### Oracle Radiology of NY P.C.; Atlantic Radiology Imaging P.C.;
### Atlantic Radiology P.C.; and Aurora Radiology P.C.)

712.     Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

713.     To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes which grant the authority to provide health services in New York.

714.     In view of their illegal corporate structure, and/or illegal control by a non-

physician, the PC Defendants have been operating in violation of New York's Insurance Laws and New York General Business Law §349 (and other statutory provisions), and thus have no standing to submit or receive assigned No-Fault benefits.

715.    The PC Defendants continue to submit assigned No-Fault claims to Allstate, and other claims remain pending with Allstate.

716.    The PC Defendants continue to challenge Allstate's prior claim denials.

717.    The PC Defendants continue to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

718.    A justifiable controversy exists between Allstate and the PC Defendants since the PC Defendants challenge Allstate's ability to deny such claims.

719.    Allstate has no adequate remedy at law.

720.    The PC Defendants will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that their activities are unlawful, and that Allstate has no obligation to pay the pending, previously-denied, and/or any future No-Fault claims submitted by any of the PC Defendants.

721.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the PC Defendants, at all relevant times, were fraudulently incorporated and/or controlled by non-licensed laypersons in violation of New York's Insurance Laws and New York General Business Law §349 (and other statutory provisions), and thus have no standing to submit or receive assigned No-Fault benefits.

## XI.    **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate Fire and Casualty Insurance

Company, Allstate New Jersey Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company, respectfully pray that judgment enter in their favor, as follows:

### COUNT I
### VIOLATIONS OF 18 U.S.C. §1962(c)
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. §1964, interests, costs and attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT II
### VIOLATIONS OF 18 U.S.C. §1962(c)
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. §1964, interests, costs and attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT III
### VIOLATIONS OF 18 U.S.C. §1962(c)
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. §1964, interests, costs and attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IV
## VIOLATIONS OF 18 U.S.C. §1962(c)
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. §1964, interests, costs and

attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT V
## VIOLATIONS OF 18 U.S.C. §1962(c)
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. §1964, interests, costs and

attorneys' fees;

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful

conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
## VIOLATIONS OF 18 U.S.C. §1962(c)
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. §1964, interests, costs and

attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT VII**
**VIOLATIONS OF 18 U.S.C. §1962(c)**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. §1964, interests, costs and attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT VIII**
**VIOLATIONS OF 18 U.S.C. §1962(c)**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. §1964, interests, costs and attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT IX**
**CONSPIRACY UNDER 18 U.S.C. § 1962(d)**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT X
## COMMON LAW FRAUD

(a)    AWARD Allstate its actual damages in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c)    AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d)    GRANT any other relief this Court deems just.

## COUNT XI
## VIOLATIONS OF N.Y. GEN. BUS. LAW § 349
## CONSUMER PROTECTION FROM DECEPTIVE ACTS AND PRACTICES

(a)    AWARD Allstate its actual damages in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c)    AWARD Allstate its costs in defending No-Fault collection suits filed by defendants seeking payment of false and fraudulent invoices; and

(d)    GRANT any other relief this Court deems just.

## COUNT XII
## UNJUST ENRICHMENT

(a)    AWARD Allstate's actual and consequential damages to be determined at trial; and

(b)    GRANT any other relief this Court deems just.

## COUNT XIII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
## DECLARATORY JUDGMENT ACT

(a)    DECLARE that Right Aid Diagnostic Medicine P.C., A Plus Medical P.C., Omega Medical Diagnostic, P.C., Shore Medical Diagnostic, P.C., Atlantic Radiology Imaging, P.C., Atlantic Radiology, P.C., Oracle Radiology of NY P.C., and Aurora Radiology, P.C. are operating in violation of Article 15 of New York's Business Corporation Law, New York Public Health Laws, New York Insurance Laws, and New York General Business Law § 349, and other statutory provisions;

(b)    DECLARE that the PC Defendants' activities are unlawful;

(c)    DECLARE that Allstate has no obligation to pay pending, previously-denied and/or future No-Fault insurance claims submitted by the PC Defendants; and

(d)    GRANT all other relief this Court deems just and appropriate.

## XII.   JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.

[SIGNATURE PAGE TO FOLLOW]

Respectfully Submitted,

SMITH & BRINK, P.C.

_____

Richard D. King, Jr. (RK8381)
Nathan A. Tilden (NT0571)
Ellen Burach Zion (EB7999)
Jasmine Garcia-Vieux (JG1805)
Michael W. Whitcher, *pro hac vice* pending
Joshua N. Garick, *pro hac vice* pending
1205 Franklin Ave, Suite 260
Garden City, NY 11530
(347) 710-0050

Attorneys for the Plaintiffs,

*Allstate Insurance Company, Allstate Indemnity Company,
Allstate Property and Casualty Insurance Company,
Allstate Fire and Casualty Insurance Company, Allstate
New Jersey Insurance Company, and Allstate New Jersey
Property and Casualty Insurance Company*

Dated: May 2, 2011

90