UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ALLSTATE INSURANCE COMPANY,
ALLSTATE INDEMNITY COMPANY,
ALLSTATE PROPERTY AND CASUALTY
INSURANCE COMPANY, ALLSTATE FIRE
AND CASUALTY INSURANCE COMPANY,
ALLSTATE NEW JERSEY INSURANCE
COMPANY, and ALLSTATE NEW JERSEY
PROPERTY AND CASUALTY INSURANCE
COMPANY,

                           Plaintiffs,

          - versus -

JOHN S. LYONS, M.D., SANNA KALIKA,
M.D., ILYA BURSHTEYN, M.D., HARVEY
STERN, M.D., JOSEPH MCCARTHY, M.D.,
RIGHT AID DIAGNOSTIC MEDICINE, P.C.,
A PLUS MEDICAL P.C., OMEGA MEDICAL
DIAGNOSTIC, P.C., SHORE MEDICAL
DIAGNOSTIC, P.C., ORACLE RADIOLOGY
OF NY P.C., ATLANTIC RADIOLOGY
IMAGING P.C., ATLANTIC RADIOLOGY,
P.C., AURORA RADIOLOGY P.C., DAVID
GOLUB, ARTHUR BOGORAZ, SIMON
KORENBLIT, EDWARD ATBAYSHAN,
ALEXANDER ZHAROV, and ALMA
BUILDING, LLC,

                          Defendants.

MEMORANDUM
AND ORDER
11-CV-2190

A P P E A R A N C E S

      SMITH & BRINK, P.C.
            1205 Franklin Avenue, Suite 260
            Garden City, New York 11530
      By:    Richard D. King
            Nathan A.  Tilden
      CADWALADER, WICKERSHAM & TAFT
         1 World Financial Center
         New York, New York 10281
      By:    William J. Natbony
            *Attorneys for Plaintiffs*

BLODNICK, CONROY, FAZIO & DIGLIO, PC
   1325 Franklin Avenue, Suite 555
   Garden City, New York 11530
By:  Charles Phillip Blattberg
   Edward K. Blodnick
   Maria Campese Diglio
   Theodore F. Goralski
   *Attorney for Defendants Lyons, Kalika, and Right Aid Diagnostic Medicine, P.C.*

GARY TSIRELMAN, PC
   65 Jay Street, 3rd Floor
   Brooklyn, New York 11201
By:  Wesley Robert Mead
   Gary Tsirelman
   Max Valerio
   *Attorney for Defendants Stern, McCarthy, Korenblit, Atbayshan, Zharov,*
   *Atlantic Radiology Imaging P.C., and Atlantic Radiology, P.C.*

JOHN GLEESON, United States District Judge:

   This is a civil action brought by insurance companies who allege that defendants have engaged in sophisticated and related schemes to fraudulently obtain insurance proceeds that were supposed to pay for medical services for people injured in automobile accidents.  Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Insurance Company, and Allstate New Jersey Property and Casualty Insurance Company (collectively, "Allstate") bring multiple causes of action against John S. Lyons, M.D., Sanna Kalika, M.D., Ilya Burshteyn, M.D., Harvey Stern, M.D., Joseph McCarthy, M.D., Right Aid Diagnostic Medicine, P.C. ("Right Aid"), A Plus Medical P.C. ("A Plus"), Omega Medical Diagnostic, P.C. ("Omega"), Shore Medical Diagnostic, P.C. ("Shore"), Oracle Radiology of NY P.C. ("Oracle"), Atlantic Radiology Imaging P.C. ("Atlantic Imaging"), Atlantic Radiology, P.C. ("Atlantic Radiology"), Aurora Radiology P.C. ("Aurora"), David Golub, Arthur Bogoraz,

Simon Korenblit, Edward Atbayshan, Alexander Zharov, and Alma Building, LLC ("Alma").[1]

Allstate asserts claims for violations of the Racketeer Influenced and Corrupt Organizations Act

("RICO"), 18 U.S.C. § 1962(c)-(d) (Counts I-XVI), common law fraud (Count XVII), violations

of § 349 of the New York General Business Law (Count XVIII), and unjust enrichment (Count

XIX). In addition to making demands for damages and injunctive relief, Allstate requests a

declaration that defendants have no right to receive payment for any previously denied, pending,

or future no-fault claims, and that Right Aid, A Plus, Omega, Shore, Oracle, Atlantic Imaging,

Atlantic Radiology, and Aurora are operating in violation of law and have engaged in unlawful

activities (Count XX). Kalika, Lyons, and Right Aid (collectively, the "Right Aid defendants")

and, separately, Stern, McCarthy, Atlantic Imaging, Atlantic Radiology, Korenblit, Atbayshan,

and Zharov (collectively, the "Atlantic defendants") move to dismiss. The Atlantic defendants

also move, in the alternative, to compel arbitration. For the reasons set forth below, I deny the

motions to dismiss in their entirety. I also deny the motion to compel arbitration with respect to

all claims except those that Allstate has not yet paid. For this residual category of claims, the

motion to compel arbitration is granted.

BACKGROUND[2]

New York's no-fault insurance law was passed "to create a simple, efficient

system that would provide prompt compensation to accident victims without regard to fault, and

in that way reduce costs for both courts and insureds." *State Farm Mut. Auto. Ins. Co. v.

Mallela*, 372 F.3d 500, 502 (2d Cir. 2004). Under the law, automobile insurance providers are

required to include in their policies coverage for injuries arising from car accidents, irrespective

---

[1]    Although originally a defendant in this case, Richard Denise has been dismissed without prejudice. *See* Denise Stipulation Dismissal Without Prejudice, ECF No. 92.

[2]    The factual allegations set forth herein, which are assumed to be true for purposes of deciding this motion, *see Patane v. Clark*, 508 F.3d 106, 111 (2d Cir. 2007), are drawn from the well-pleaded allegations in the Complaint and its incorporated exhibits.

of who is to blame for the accident.  The no-fault scheme thus "supplant[s] the state's common law tort remedies for most injuries associated with automobile accidents."  *Id.*  The law requires car insurance providers to reimburse injured persons for "basic economic loss," including medical expenses, and it sets forth a schedule of permissible charges for specific services.  *Id.* (citing N.Y. Ins. Law §§ 5102, 5108).  An injured person who seeks medical treatment may assign her right to no-fault benefits to her medical provider, and such assignment is typical.

According to the well-pleaded allegations in the Complaint,[3] defendants were involved in a massive conspiracy to defraud Allstate for benefits under the no-fault law.  The conspiracy consisted of several discrete clusters of actors linked together by Lyons.  *Id.* ¶¶ 93-137, 505-516.  The central entity within each cluster was a professional corporation ("PC") that purported to provide health care services for individuals injured in car accidents.  *Id.* ¶¶ 37-65. All of the PCs involved were owned on paper by licensed medical doctors ("paper owners"), as required by New York law.  *Id.* ¶¶ 6-9, 37-65.  However, the PCs were in fact controlled by other individuals or entities that were not doctors ("actual owners").  *Id.* ¶¶ 394-504.

Lyons served as a radiologist for each of the PCs and purported to analyze Magnetic Resonance Imaging ("MRIs") they performed for their injured patients.  *Id.* ¶¶ 505-16. However, the reports he produced were fabricated.  *Id.* ¶¶ 93-137.  Some were based on MRIs of such poor quality that they could not serve any legitimate diagnostic purpose, *id.* ¶ 98; some were falsely duplicated for multiple patients, *id.* ¶ 95; some identified conditions that did not appear on the corresponding MRIs, *id.* ¶ 96; some otherwise diagnosed conditions that did not exist, *id.* ¶ 97; and some ignored conditions that were apparent from the MRIs, *id.* ¶ 135.

---

[3]     All references to the Complaint refer to the Second Amended Complaint, November 1, 2011, ECF No. 99.

The PCs provided these worthless MRIs and fake MRI reports, as well as other medically unnecessary services purportedly recommended or justified by the fake MRI reports, to individuals eligible for no-fault benefits. *Id.* ¶¶ 93-137, 126, 137. After receiving assignment of their patients' no-fault benefits, the PCs then billed Allstate by mail for these medically unnecessary services under the no-fault law. *Id.* ¶¶ 517-524. In such billings, the PCs misrepresented that they were organized in accordance with New York law and that the medical treatment for which they sought payment was medically necessary and compensable under the no-fault law. *Id.* Allstate remitted payment as demanded to the PCs in sums totaling more than $4 million. *Id.* ¶ 16.

The clusters involved in this lawsuit include the following: (1) the PC Right Aid and its paper owner Kalika (the "Right Aid cluster"); (2) the PC Atlantic Imaging, its paper owner Stern, and its actual owners Korenblit, Atbayshan, and Zharov (the "Atlantic Imaging cluster"); (3) the PC Atlantic Radiology, its paper owner McCarthy, and its actual owners Korenblit, Atbayshan, and Zharov (the "Atlantic Radiology cluster"); (4) the PC A Plus and its paper owner Burshteyn; (5) the PC Omega and its paper owner Burshteyn; (6) the PC Shore and its paper owner Burshteyn; (7) the PC Oracle and its actual owner Alma, a management company owned and operated by Golub and Bogoraz; and (8) the PC Aurora and its paper owner Denise, who has been terminated from this lawsuit. Allegations specific to any particular defendant or cluster are set forth where relevant in the discussion that follows.

## DISCUSSION

A. *Motion to Dismiss*

1. *Standard of Review*

The Right Aid defendants and the Atlantic defendants (the "moving defendants" or "defendants") move to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted.  In reviewing such a motion, I must assume the truth of all well-pleaded factual allegations, draw all inferences in the light most favorable to the plaintiffs, and grant the motion only if the complaint so viewed fails "to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

2.    *RICO Claims*

Passed in 1970 as part of the fight against organized crime, *see United States v. Turkette*, 452 U.S. 576, 588-89 (1981), RICO prohibits "person[s]" from engaging in four kinds of actions that relate to "enterprise[s]" involved in interstate commerce.  *See* 18 U.S.C. § 1962. Subsection 1962(a) makes it illegal "to use or invest . . . any part" of "any income derived . . . from a pattern of racketeering activity" in the "acquisition of any interest in, or the establishment or operation of, any enterprise"; subsection 1962(b) bars "acquir[ing] or maintain[ing] . . . any interest in or control of any enterprise" "through a pattern of racketeering activity"; subsection 1962(c) makes it unlawful "to conduct or participate . . . in the conduct of [an] enterprise's affairs through a pattern of racketeering activity" when "employed or associated with" that enterprise; and subsection 1962(d) prohibits "conspir[ing] to violate" any of these substantive provisions.

RICO creates both criminal and civil liability for those who violate any of the subsections of § 1962.  Section 1964 provides a private right of action for damages for RICO violations and confers jurisdiction upon federal district courts to hear such suits: "Any person injured in his business or property by reason of a violation of section 1962 . . . may sue therefor in any appropriate United States district court . . . ." 18 U.S.C. § 1964(c); *see also* § 1964(a).  A

6

successful civil RICO plaintiff "shall recover" treble damages for his injuries, as well as the cost

of the suit, including attorney's fees.  § 1964(c).

      Allstate brings this action under § 1964(c), alleging injury caused by the

defendants' violations of § 1962(c) and § 1962(d).  In order to state a claim under § 1962(c), a

plaintiff must plead three principal elements: "(1) the conduct (2) of an enterprise (3) through a

pattern of racketeering activity."  *See Salinas v. United States*, 522 U.S. 52, 62 (1997).  To state a

claim under § 1962(d), a plaintiff must plead that the defendant made an agreement to further or

facilitate a violation of § 1962(a), (b), or (c).  *Id.* at 65.  The moving defendants cite multiple

purported defects with Allstate's § 1962(c) and § 1962(d) claims, which I address in turn.

      a.    *Allegations of Enterprise*

      The Act defines "enterprise" to "include[] any individual, partnership,

corporation, association, or other legal entity, and any union or group of individuals associated in

fact although not a legal entity."  18 U.S.C. § 1961(4). Although the statute does not define the

outer boundaries of what constitutes an enterprise, it is clear that partnerships, corporations, and

"other legal entit[ies]," as well as associations-in-fact, may be RICO enterprises.  In this case,

Allstate alleges that, in each cluster, the PC, a legal entity, constituted the relevant enterprise

under RICO.  Compl. ¶¶ 550, 575, 600, 625, 650, 675, 700, 725.

      The moving defendants argue that Allstate has failed to adequately plead an

"enterprise" for three reasons.  First, defendants charge that an entity whose sole function is

fraud may not be an enterprise under RICO, and defendants argue that the PCs' only alleged

function was fraud.  They appear to suggest that when the sole function of an enterprise is fraud,

the "enterprise" element and "pattern of racketeering activity" element impermissibly merge.

This objection is easily dispensed with; the Supreme Court has made clear that a wholly

illegitimate enterprise, just like a legitimate enterprise, may constitute an enterprise under RICO. *Turkette*, 452 U.S. 576.  The elements of "enterprise" and "pattern of racketeering activity" remain distinct elements under RICO, even when the allegations and proof of those elements overlap.  *Id.* at 583.

Second, defendants contend that the Complaint fails to appropriately plead an association-in-fact enterprise.[4]  However, Allstate has not alleged an association-in-fact enterprise.  The alleged enterprises are the PCs, and corporations are expressly included in the definition of enterprise.  *See* 18 U.S.C. § 1961(4); *see also First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) ("[A]ny legal entity may qualify as a RICO enterprise.").

Finally, defendants maintain that the Complaint runs afoul of the rule that a RICO enterprise be distinct from the person(s) charged with conducting the affairs of the enterprise under § 1962(c).  *See Satinwood*, 385 F.3d at 173.  They suggest because the defendants charged with the RICO violations (*i.e.*, the paper owners, the actual owners, and Lyons) are all employees of the charged RICO enterprises (*i.e.*, the PCs), the defendants are not distinct from the enterprises.

This argument misapprehends either the state of the law or the allegations of the Complaint.  For each of the RICO claims, the Complaint alleges that, within each cluster, the PC constitutes the relevant enterprise.  The paper owners, the actual owners, and Lyons are the named defendants; in other words, they are alleged to be the persons who conducted the affairs

---

[4]      Specifically, defendants argue that Allstate failed to plead facts that suggest that the enterprise in the Right Aid cluster exhibited hierarchy, organization, and control.  Despite defendants' apparent assumption to the contrary, hierarchy, organization, and control are not always necessary in an association-in-fact enterprise.  The defining characteristic of an association-in-fact enterprise is structure, which is comprised of at least three features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle v. United States*, 129 S. Ct. 2237, 2244 (2009).

of the enterprises.  That a RICO defendant is employed by the alleged corporate enterprise does not violate the distinctness rule because an employee of a corporation and the corporation are not the same entity.  Rather, a "corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001).  RICO's distinctness rule is thus satisfied "when a corporate employee [the RICO defendant] unlawfully conducts the affairs of the corporation" alleged to constitute the RICO enterprise.  *Id.* at 166.

It is true that the situation might be different if the Complaint named a corporation as the RICO *defendant* and then alleged that the corporation together with its own employees constituted an association-in-fact enterprise.  *See id.* at 164; *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 343-45 (2d Cir. 1994).  However, such is not the case here.  In this case, Allstate expressly alleges that the corporate entity in each cluster, the PC, *alone* constitutes the enterprise.  Furthermore, the PCs are not included as RICO defendants; rather, all of the RICO defendants are natural persons.  Under clear Supreme Court precedent, this poses no problem under the distinctness rule.

b.    *Allegations of the Pattern of Racketeering Activity*

RICO defines "racketeering activity" as "any act or threat" involving a number of crimes and offenses, including murder, kidnapping, gambling, and mail fraud.  18 U.S.C. § 1961(1).  A "pattern" of racketeering activity requires, *inter alia*, at least two acts of racketeering activity.  § 1961(5).  As the Supreme Court has explained, in order to properly plead a pattern of racketeering activity, a complaint must set forth factual allegations from which two things may be reasonably inferred: that the racketeering acts that purport to make up the pattern

(the "predicate acts") are related to each other and that those acts "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

The Complaint alleges that defendants' pattern of racketeering activity consisted of repeated acts of mail fraud. *See* Compl. ¶¶ 517-24; *see also* 18 U.S.C. § 1341 (mail fraud statute). Specifically, Allstate alleges that defendants committed mail fraud by submitting numerous claims for payment of no-fault benefits in which they fraudulently misrepresented (1) that the PCs were eligible for reimbursement, despite the fact that they were fraudulently incorporated and therefore ineligible for reimbursement under the no-fault law; and (2) that the services for which the PCs requested reimbursement were medically necessary.

While defendants appear to acknowledge that the alleged predicate acts satisfy the relatedness requirement, they suggest that those acts fail either to amount to or to pose a threat of continued criminal activity. In order to plead predicate acts that amount to continued criminal activity (*i.e.*, in order to plead "closed-ended continuity"), Allstate must plead a "series of related predicates extending over a substantial period of time." *H.J.*, 492 U.S. at 242. No single rule exists for how to plead predicate acts that pose a threat of continued criminal activity (*i.e.*, "open-ended continuity"). *Id.* Rather, open-ended continuity "depends on the specific facts of each case." *Id.* At a minimum, however, it is clear that a "threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes" or where "the predicates are a regular way of . . . conducting or participating in an ongoing and legitimate RICO enterprise." *Id.* at 242-43.

Putting aside the question of closed-ended continuity for the purposes of this motion, there is no question that Allstate's Complaint properly alleges open-ended continuity. In light of the Complaint's allegations of fraudulent incorporation and of the very numerous and

regular inflated billings, it is reasonable to infer that the PCs operated by defendants existed for criminal purposes. And for the same reasons, even if the PCs were legitimate businesses, it would be reasonable to infer that defendants' acts of mail fraud constituted a regular way of conducting the affairs of those businesses. Defendants' contention that their acts of fraud were "isolated, terminable defects" fails to take seriously the court's obligation at this stage to assume the truth of the well-pleaded factual allegations in the Complaint and to draw all reasonable inferences in favor of Allstate. *See Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995).

The Atlantic defendants argue that even if I find open-ended continuity with respect to all other defendants in this case, Atlantic Radiology and McCarthy should be viewed differently. Because Atlantic Radiology is now defunct, and because McCarthy is not a paper owner of any existing PC, defendants argue that they do not pose a threat of continued criminal activity.

This argument is without merit. First, Atlantic Radiology is not a charged RICO defendant and thus the Complaint need not establish the relevant RICO elements with respect to it. With respect to McCarthy, a RICO plaintiff relying on open-ended continuity is not required to allege a currently-existing threat that the pattern of racketeering activity will continue. It is sufficient that a threat of continuity inhered in the alleged racketeering activity, even if that activity lasted only a brief time and is indisputably over. *See H.J.*, 492 U.S. at 241 (holding that open-ended continuity refers to "past conduct that by its nature projects into the future with a threat of repetition"). "Subsequent events are irrelevant to the continuity determination . . . because 'in the context of an open-ended period of racketeering activity, the threat of continuity must be viewed at the time the racketeering activity occurred.'" *Heinrich v. Waiting Angels*

11

*Adoption Servs.*, No. 09-2470, 2012 WL 371947, at *12 (6th Cir. Feb. 7, 2010) (quoting *United States v. Busacca,* 936 F.2d 232, 238 (6th Cir. 1991)); *accord Wells Fargo Century, Inc. v. Hanakis*, No. 04 Civ. 1381, 2005 WL 1523788, at *6-7 (E.D.N.Y. June 28, 2005); *Friedman v. Hartmann*, No. 91 Civ. 1523, 1994 WL 376058, at *1 (S.D.N.Y. July 15, 1994) ("The mere fact that RICO defendants terminate their conduct does not prevent the Court from finding open-ended continuity."). Here, Allstate has adequately alleged that Atlantic Radiology's reason for being was to facilitate McCarthy's – as well as Lyons's and the other Atlantic defendants' – racketeering activity of fraudulently obtaining no-fault benefits. Accordingly, a threat of continuity has been properly pled.[5]

Defendants also claim that the Complaint fails to plead that the defendants engaged in "racketeering activity." Although they acknowledge that mail fraud constitutes racketeering activity, they claim that Allstate's allegations of mail fraud are legally insufficient. Specifically, defendants first complain that Allstate has failed to plead that defendants fraudulently incorporated the PCs. Therefore, according to defendants, defendants' representations that the PCs were eligible for payment under the no-fault law do not amount to mail fraud.

In *State Farm Mutual Automobile Insurance Co. v. Mallela*, 4 N.Y.3d 313 (2005), the New York Court of Appeals upheld an insurance regulation that renders ineligible to be

---

[5]     In addition, insofar as the other Atlantic defendants imply that their conduct of Atlantic Radiology should not be considered in my determination of whether their acts satisfy the open-ended-continuity requirement, I wholly reject this suggestion. According to the Complaint, Atlantic Radiology is defunct in name only; it has effectively become Atlantic Imaging. Indeed, both PCs have the same registered corporate addresses, have similar logos, have similar corporate names, use(d) the identical website, retained Lyons to read MRIs, engaged in the same kinds of fraud, and had the same actual owners. Compl. ¶¶ 435-43. RICO does not permit individuals to escape liability through mere formalities such as reincorporation of an enterprise. Thus insofar as any alleged defendant engaged in a predicate act in his conduct of the affairs of Atlantic Radiology, I consider that act together with any act he took in his conduct of the affairs of Atlantic Imaging to determine whether the open-ended-continuity requirement is satisfied. For the reasons already discussed, the Complaint pleads open-ended continuity with respect to all of the RICO defendants.

reimbursed under the no-fault law any health care provider that "fails to meet any applicable

New York State or local licensing requirement."  N.Y. Comp. Codes R. & Regs. tit. 11 § 65-

3.16(a)(12).  New York licensing requirements in turn "prohibit nonphysicians from owning or

controlling medical service corporations."  *Mallela*, 4 N.Y.3d at 321.   Under *Mallela* then, a

health care provider that is fraudulently licensed – because it is in fact owned or controlled by

non-physicians – makes a misrepresentation when it claims eligibility for reimbursement.  *Id.*

By extension, when individuals engage in a scheme by which they seek reimbursement for

services provided by a fraudulently incorporated health care provider, and that scheme is carried

out through the mail, those individuals commit mail fraud.  *See United States v. Walker*, 191

F.3d 326, 334 (2d Cir. 1999) (identifying the elements of mail fraud as "(1) a scheme to defraud

victims of (2) money or property, through the (3) use of the mails").

   There is no dispute that the defendants represented that the PCs were eligible to

receive reimbursement for medical services they purported to provide or that they made these

representations through the mail.  The debate here centers solely on whether Allstate's

Complaint sufficiently alleges that the PCs were fraudulently incorporated – that is, whether

Allstate has sufficiently alleged that the PCs were owned or controlled by non-physicians.

Defendants contend that Allstate's allegations demonstrate that the PCs simply "delegate[d] . . .

responsibility in non-medical administrative matters" to the actual owners in this case, but that

the paper owners ultimately maintained ownership and control of the PCs.  Defs.' Mem. Supp.

Mot. Dismiss 11, ECF No. 83.

   Again, defendants fail to appreciate the standard of review on a motion to dismiss.

Construing the factual allegations of the Complaint as true and drawing all inferences in favor of

the plaintiffs, it is easy to find that Allstate has adequately pled fraudulent incorporation here.

With regard to the Atlantic Imaging cluster, the Complaint alleges that the paper owner (Stern) had no knowledge of Lyons's compensation, did not know whether Lyons was an employee or an independent contractor, was unable to identify Lyons, had met Lyons only once, could not identify the PC's landlord, did not know the type of equipment the PC leased, admitted that he was an absentee owner, did not hire the PC's management company and was instead approached by the management company (which was operated by the alleged actual owners Korenblit, Atbayshan, and Zharov), allowed his name to be signed by the management company, did not invest any money in the PC, could not identify the attorneys or law firms retained to pursue collections on behalf of the PC, could not meaningfully discuss how legal settlements or arbitration awards were allocated, and could not identify the PC's accountants.  Compl. ¶¶ 450-62.  These factual allegations are more than sufficient to raise the reasonable inference that Atlantic Imagining was actually owned and controlled not by Stern, who is a physician, but by non-physicians Korenblit, Atbayshan, and Zharov.

Furthermore, as discussed above, the factual allegations in the Complaint permit the reasonable inference that Atlantic Radiology, in effect, simply renamed itself Atlantic Imaging.  Thus in light of the factual allegations just discussed with respect to Atlantic Imaging, the Complaint adequately alleges that Atlantic Radiology was fraudulently incorporated.[6]

With regard to the Right Aid cluster, the Complaint alleges that the paper owner Kalika never met Lyons and that she did not know his first name.  Compl. ¶¶ 424-25.  Although

---

[6]      The Atlantic defendants also argue that, in light of stipulations signed by Allstate in separate matters not before this Court, collateral estoppel bars Allstate from arguing that Atlantic Imaging or Atlantic Radiology was fraudulently incorporated.  This argument is without merit.  Even assuming these stipulations are items of which I may take judicial notice and properly consider on a motion to dismiss, the stipulations are insufficient to establish that Allstate intended to be bound to those stipulations in future unrelated litigation.  *See Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 369 n.4 (2d Cir. 1995) (citing *Red Lake Band v. United States*, 607 F.2d 930, 934 (Ct. Cl. 1979)); *Red Lake Band*, 607 F.2d at 934 ("[A]n issue is not 'actually litigated' for purposes of collateral estoppel unless the parties to the stipulation manifest an intent to be bound in a subsequent action.").  Therefore, collateral estoppel does not apply.

this is a closer case, I conclude that these facts, considered against the full backdrop of Right Aid's scheme as alleged in the Complaint, are sufficient to reasonably raise the inference that Kalika lacked true ownership or control over Right Aid and instead ceded control to non-physician third parties.

In addition, defendants find fault with Allstate's mail fraud allegations premised upon defendants' misrepresentations that the medical services for which they sought reimbursement were medically necessary and compensable under the no-fault law ("bad medicine" fraud). According to defendants, Allstate fails to plead bad medicine fraud with the requisite level of particularity under Rule 9(b) of the Federal Rules of Civil Procedure. Specifically, they contend (1) that Allstate failed to satisfy its burden of alleging that each defendant had the required scienter for fraud, and (2) that Allstate failed to specify "the contents of the communications, who was involved, where and when they took place, and . . . why they were fraudulent." *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993).

Defendants' arguments are unpersuasive. Considering their second contention first, "[i]n the RICO context, Rule 9(b) calls for the complaint to specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999) (quoting *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992)) (internal quotation marks omitted). Allstate has conformed to these requirements, explaining in detail the contours of the fraudulent scheme it alleges. It provides several representative examples of the thousands of claims at issue in this case. In each example, Allstate sets forth facts specifying the ways in which the MRI report purportedly analyzed in connection with the claim for payment was

grossly misrepresentative.  Additionally, Allstate attaches to its Complaint a series of charts that include each of the charges submitted by the defendants that it believes were fraudulent.  *See* Compl. Exs. 14-15, 19-20.  The charts detail the entity that submitted each claim, as well as the corresponding claim number, the year Allstate paid the claim, and the amount paid by Allstate.  Such information clearly directs defendants to the specific misrepresentations Allstate is alleging.  Under the circumstances, the specificity requirement of 9(b) requires no more regarding the who, what, where, when, how, and why of the alleged fraud in this case.  *See PaineWebber*, 189 F.3d at 173.

Furthermore, there is no question that the Complaint alleges that the defendants had the scienter required for fraud.  To adequately allege scienter for mail fraud, one must "allege facts that give rise to a strong inference of fraudulent intent."  *Id.* (quoting *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996)) (internal quotation marks omitted).  This may be done either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)) (internal quotation marks omitted).  Even putting aside circumstantial evidence that defendants consciously misbehaved and/or were reckless, which Allstate certainly pleads, the Complaint sufficiently establishes that defendants had both the motive and opportunity to commit fraud.  According to the Complaint, defendants gained millions of dollars through their alleged fraud; surely this constitutes motive.  And the Complaint alleges that the defendants together entered into a scheme whereby they provided bogus MRIs and then requested reimbursement for false charges stemming from those MRIs – certainly an

opportunity for fraud.  The Complaint thus raises the strong inference that defendants possessed fraudulent intent, satisfying Rule 9(b).

        c.    *Allegations of Injury and Causation*

        In order to bring a civil RICO claim, a private plaintiff must demonstrate that "the RICO violation at issue was a proximate cause of the injury to the plaintiff's business or property for which redress is sought." *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1344 (2d Cir. 1994).  The Atlantic defendants argue Lyons's fraud was the source of Allstate's injury and that they did nothing to facilitate or conceal Lyons's fraud.  Therefore, these defendants conclude, the Complaint fails to allege that the Atlantic defendants' conduct was a proximate cause of any injury Allstate suffered.

        Viewing the Complaint in the light most favorable to Allstate, I must reject the Atlantic defendants' argument.  Read in that light, the Complaint clearly alleges that the Atlantic defendants joined with Lyons to perpetrate the fraudulent scheme that injured Allstate.  Compl. ¶¶ 505-16.  Together, each cluster of defendants entered into an agreement with Lyons to bilk money from Allstate by (1) misrepresenting that the PCs were eligible to receive reimbursement under the no-fault law and (2) requesting payment for services purportedly provided by the PCs that were not medically necessary or compensable.  The alleged RICO violations of each defendant proximately caused Allstate's financial injury and therefore Allstate may properly bring this suit.

        d.    *Ripeness*

        Defendants argue that I must dismiss Allstate's RICO claims because they are unripe.[7]  They maintain that to have standing to pursue a RICO claim, Allstate must have

---

[7]    Defendants use ripeness and standing terminology interchangeably.  I adopt their terminology to describe their argument, although I understand the argument to relate only to statutory standing.

sustained clear and definite damages.  According to defendants, because Allstate may yet recover money through state lawsuits for fraud, which would mitigate any injury suffered, Allstate's damages are not yet clear and definite.

Defendants cite a host of cases for this proposition, but in each of them the plaintiffs sued to recover money they had loaned or were otherwise entitled to receive from the RICO defendants.  *See Motorola Credit Corp. v. Uzan*, 322 F.3d 130 (2d Cir. 2003); *DeSilva v. North Shore-Long Island Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497 (E.D.N.Y. 2011); *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 726 F. Supp. 2d 225 (E.D.N.Y. 2010); *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392 (S.D.N.Y. 2000).  The courts held that the plaintiffs' RICO damages were not certain until they had tried to collect that money by asserting either their contractual or their other (non-RICO) legal rights.  *Motorola*, 322 F.3d at 135-36; *DeSilva*, 770 F. Supp. 2d at 521-22; *DLJ*, 726 F. Supp. 2d at 236-37; *Goldfine*, 118 F. Supp. 2d at 397-99; *accord First Nat'l Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994) ("Thus, a plaintiff who claims that a debt is uncollectible because of the defendant's conduct can only pursue the RICO treble damages remedy after his contractual rights to payment have been frustrated.").

The case before me is easily distinguishable.  Allstate is not seeking redress for an uncollectible debt; rather, it seeks damages for paying millions of dollars to defendants based upon their allegedly fraudulent claims for no-fault benefits.  In such a case, I find that Allstate's damages are clear and definite, and defendants have directed me to no authority that leads me to believe otherwise.[8]

---

[8]    The Right Aid defendants raise several additional and undeveloped arguments in their reply memorandum.  I need not consider any arguments raised for the first time in a reply memorandum, *see, e.g.*, *Church & Dwight Co., Inc. v. Kaloti Enters. of Mich., L.L.C.*, No. 07 Civ. 0612, 2012 WL 293594, at *3 (E.D.N.Y. Jan. 31, 2012), and I decline to do so here.

e.    *RICO Conspiracy*

Defendants suggest that I must dismiss Allstate's RICO conspiracy claims because the substantive RICO claims are defective.  Because I find that the substantive RICO claims are legally sufficient, defendants' argument fails.  Defendants make no other attack on Allstate's RICO conspiracy claims.

3.    *Common Law Fraud*

In order to plead a claim for New York common law fraud, a plaintiff must allege that the defendant made a material misrepresentation of a fact, with knowledge of its falsity and an intent to induce reliance, that the plaintiff justifiably relied on defendant's misrepresentation, and that the plaintiff suffered damages.  *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009).  In this case, the Complaint alleges that the defendants defrauded Allstate by misrepresenting in their no-fault claims (1) that they were eligible to receive reimbursement under the no-fault law and (2) that they were requesting reimbursement for services that were medically necessary and compensable.  Compl. ¶¶ 739-42.  Allstate alleges that defendants made these representations with knowledge of their falsity and with the purpose of inducing Allstate to pay those claims, that Allstate reasonably relied on defendants' misrepresentations, and that Allstate incurred damages as a result.  *Id.* ¶¶ 743-45.

Defendants claim that Allstate has failed to plead fraud because it has not properly alleged justifiable reliance.  According to defendants, because Allstate is a "sophisticated insurer," *see* Defs.' Mem. Supp. Mot. Dismiss 21, ECF No. 80, it had the ability to detect defendants' alleged fraud and is therefore precluded from arguing that it justifiably relied on their alleged misrepresentations.

I emphatically reject this notion.  Reliance is unjustified if "the misrepresentation allegedly relied upon was not a matter within the peculiar knowledge of the party against whom the fraud is asserted, and could have been discovered by the party allegedly defrauded through the exercise of due diligence." *Cohen v. Cerier*, 663 N.Y.S. 2d 643, 644 (App. Div. 1997).  Even assuming that this is the kind of case in which due diligence was required by Allstate – a dubious assumption – the defendants' fraud in this case was sophisticated and deep and could not have been discovered with such diligence.  The suggestion that Allstate bore the responsibility to discover that defendants had covertly allotted ownership and control of the PCs to non-physicians is absurd.  Allstate was entitled to rely on the representations that defendants made to it and to the New York Department of State regarding the ownership of the PCs.  It is similarly incorrect to claim that Allstate was remiss in relying on defendants' facially reasonable diagnoses and claims for payment and failing to uncover their falsity.  In short, regardless of the strength of Allstate's investigatory capabilities, it is not barred from asserting fraud claims solely for failing to detect – within the no-fault law's 30-day window, no less – the complex fraudulent schemes attributed to defendants here.  Allstate has adequately pled the element of justifiable reliance.

For the reasons addressed elsewhere in this order, I further conclude that Allstate's claims for fraud are pled with the requisite specificity and are otherwise sufficient.

4.  *Consumer Protection Claims*

Under § 349 of the New York General Business Law, it is unlawful to engage in "[d]eceptive acts or practice in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.  N.Y. Gen. Bus. L. § 349(a).  Although similar to fraud claims in many ways, § 349 claims are unique in that they "must be predicated on a deceptive act

or practice that is 'consumer oriented.'"  *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d

330, 344 (1999) (quoting *Owego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,

85 N.Y.2d 20, 25 (1995)).  Allstate contends that defendants violated § 349 by making the same

two types of misrepresentations charged in Allstate's fraud and RICO claims – *i.e.*, that the PCs

were eligible for reimbursement under the no-fault law and that they sought reimbursement for

medically legitimate services.

Defendants argue that Allstate has failed to plead a violation of § 349 because

their alleged misrepresentations were not consumer-oriented.  Rather, they were made by one

private party to another, neither acting in a consumer role, and are therefore outside of the scope

of conduct that § 349 was intended to reach.

Although defendants' argument has some traction, I conclude that the § 349

claims survive.  A plaintiff establishes consumer-oriented conduct by showing that "the acts or

practices have a broader impact on consumers at large" in that they are "directed to consumers"

*or* that they "potentially affect similarly situated consumers."  *Oswego*, 85 N.Y.2d at 25, 27.

Indeed, so long as the conduct is consumer-oriented, even a defendant's business competitor may

bring a claim under § 349, provided the competitor is incidentally harmed by the defendant's

deceptive conduct.  *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995)

("The critical question [under § 349] is whether the matter affects the public interest in New

York, not whether the suit is brought by a consumer or a competitor.").   Here, the defendants'

scheme is alleged to have unlawfully stripped millions of dollars from Allstate, which has likely

increased the premiums of consumers.  In light of the resulting burden on the public – a broad

impact on consumers at large – I conclude that defendants' alleged misrepresentations were

sufficiently consumer-oriented to fall within the ambit of § 349.  *See Allstate Ins. Co. v.*

*Rozenburg*, 590 F. Supp. 2d 384, 394-95 (E.D.N.Y. 2008) (adopting similar logic); *but see Allstate Ins. Co. v. Bogoraz*, No. 10 Civ. 5286, 2011 WL 2421045, at *6 (E.D.N.Y. June 10, 2011) (finding upon similar facts that plaintiff failed to demonstrate that defendants' alleged conduct was consumer-orientated).  I therefore conclude that Allstate's claims for violations of § 349 are legally sufficient.

> 5.    *Unjust Enrichment*

To state a claim for unjust enrichment, a plaintiff must allege "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.*, 448 F.3d 573, 586 (2d Cir. 2006).  Allstate's claims for unjust enrichment are premised on defendants' alleged misrepresentations, which caused Allstate to remit payment to defendants for claims for which they were not entitled to reimbursement.  Compl. ¶¶ 758-62.

Defendants assert that I must dismiss Allstate's unjust enrichment claims because Allstate's insurance contracts govern its relationships with the defendants, which they believe precludes any quasi-contract recovery for their actions.  In this case, however, Allstate's unjust enrichment claims are "predicated on conduct not covered by the contract."  *Sergeants Benevolent Ass'n Annuity Fund v. Renck*, 796 N.Y.S.2d 77, 81 (App. Div. 2005).  Rather, they stem from defendants' misrepresentations, and they are therefore properly asserted.

In addition to being inapplicable here, the rule defendants would have me adopt – that an unjust enrichment claim is never cognizable where a valid contract exists between the parties – is too broadly stated.  For example, where one party to a contract accidentally pays another more than the contract requires, the overpayer has an unjust enrichment claim to recover the excess.  *See, e.g.*, *Kirby McInerney & Squire, LLP v. Hall Charne Burce & Olson, S.C.*, 790

N.Y.S.2d 84, 85 (App. Div. 2005).  That the parties remain bound by their contract in other respects does not bar a claim to recoup the mistaken overpayment.

B.      *Motion To Compel Arbitration*

The Atlantic defendants also move to compel arbitration.  They argue that New York Insurance Law § 5106(b) and the individual insurance contracts governing the allegedly fraudulent billings at issue (the "Allstate insurance contracts") give them the option to resolve the instant dispute through arbitration.  I find that the scope of the arbitration clause under § 5106(b) and the individual contracts does not reach any of the claims before me except those that Allstate has not yet paid.  I therefore deny the motion to compel arbitration as to all claims but those still pending before Allstate.

Section 5106(b) of the New York no-fault insurances law requires that:

> Every insurer shall provide a claimant with the option of submitting any dispute involving the insurer's liability to pay first party benefits, or additional first party benefits, the amount thereof or any other matter which may arise pursuant to subsection (a) of this section to arbitration pursuant to simplified procedures to be promulgated or approved by the superintendent.

N.Y. Ins. Law § 5106(b).  Subsection (a) of the same provision in turn provides that:

> Payments of first party benefits and additional first party benefits shall be made as the loss is incurred. Such benefits are overdue if not paid within thirty days after the claimant supplies proof of the fact and amount of loss sustained. If proof is not supplied as to the entire claim, the amount which is supported by proof is overdue if not paid within thirty days after such proof is supplied. All overdue payments shall bear interest at the rate of two percent per month. If a valid claim or portion was overdue, the claimant shall also be entitled to recover his attorney's reasonable fee, for services necessarily performed in connection with securing payment of the overdue claim, subject to limitations promulgated by the superintendent in regulations.

*Id.* § 5106(a).  According to defendants, the Allstate insurance contracts either adopt verbatim the above language or must be construed to do so.[9]  *See id.* § 5103(h) ("Any policy of insurance . . . which does not contain provisions complying with the requirements of [Article 51] shall be construed as if such provisions were embodied therein.").

The question is thus whether the arbitration clause in § 5106(b) reaches the kind of suit before me: an affirmative suit by insurance companies to claw back money already paid to claimants on grounds of fraud.  In light of the "absence of authoritative law from [New York's] highest court" regarding the scope of § 5106(b), my role as a district judge is to predict how the New York Court of Appeals would interpret the provision. *See DiBella v. Hopkins*, 403 F.3d 102, 111-12 (2d Cir. 2005).

Examining the text, § 5106(b) appears broad at first blush.  It mandates that insurance companies provide claimants with the opportunity to arbitrate "*any* dispute" that "involv[es] the insurer's liability to pay first party benefits."  N.Y. Ins. Law § 5106(b) (emphasis added).  Noting that Allstate seeks by this suit to effectively exonerate itself from past and future liability for defendants' reimbursement claims, defendants maintain that § 5106(b) requires Allstate to offer defendants the option of resolving this dispute by arbitration.

Read in isolation, the language defendants rely on supports their argument.  However, defendants ignore crucial additional statutory language.  Specifically, § 5106(b)'s arbitration clause extends to disputes "involving the insurer's liability to pay first party benefits, or additional first party benefits, the amount thereof or any *other* matter which may arise

---

[9]     It has come to my attention that the Allstate insurance contracts may, in fact, contain arbitration clauses that are not identical to the statutory language of § 5106(b).  In light of the Atlantic defendants' written and in-court representations to the contrary, and Allstate's assent by silence as to such representations, I find that any argument that the contractual language is either broader or narrower than the statutory language is waived.  I treat the contractual language and the statutory language as identical.

pursuant to subsection (a) of [§ 5106]." § 5106(b) (emphasis added).  The use of the word "other" in defining the residual category of disputes covered by the arbitration clause suggests that each of the preceding categories of disputes are also "matter[s] which may arise pursuant to subsection (a)" of § 5106.  Otherwise, the word "other" would be superfluous, and courts must avoid interpretations that deprive any statutory language of meaning.  *State Street Bank & Trust Co. v. Salovaara*, 326 F.3d 130, 139 (2d Cir. 2003).  The scope of § 5106(b)'s arbitration clause is thus significantly narrower than defendants suggest:  It is limited to disputes that arise from the requirements of subsection (a).  Therefore, if subsection (a) has nothing to say about a particular matter, any dispute stemming from that matter will fall outside the scope of subsection (b) as well.  By contrast, if subsection (a) mandates or prohibits a particular behavior, any dispute over that behavior (or lack thereof) will be subject to arbitration under subsection (b).

Structurally, the parallelism of subsections (a) and (b) is both rational and intuitive.  Section 5106 creates the "[f]air claims settlement" procedures under New York's no-fault law.  Subsection (a) contains rules governing when insurance companies must pay claims for benefits and the potential monetary penalties for nonpayment or untimely payment.  Subsection (b), in turn, makes arbitration available for disputes stemming from claims for benefits.  By incentivizing the prompt payment of claims and extending to claimants the option to arbitrate their disputes, subsections (a) and (b) work in tandem to quickly and efficiently direct no-fault benefits to people injured in automobile accidents.  *See State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500, 502 (2d Cir. 2004).  Because the speedy resolution of benefits claims depends on both subsections, it is logical that the subsections are congruent.

Although there is little case law on the proper scope of subsection (b), the case law on subsection (a) is uniform and clear:  The requirements of subsection (a) are not implicated

by an affirmative action by an insurer to recover for fraud, such as the case before me. As mentioned above, subsection (a) sets forth a deadline for the timely payment of insurance claims (the "30-day rule") and the monetary penalties that attend untimely payment. Under the 30-day rule, when an insurer fails to pay or deny a claim within 30 days after a claimant has supplied proof of his claim, that insurer is barred from asserting most defenses in any subsequent suit (or arbitration) brought by the claimant for his benefits payment. *Hosp. for Joint Diseases v. Travelers Prop. Cas. Ins. Co.*, 9 N.Y.3d 312, 317-18 (2007). When the insurer violates the 30-day rule, the claimant may also recover interest and reasonable attorney's fees for services to secure payment of the overdue claim. *Id.*

Courts that have addressed the issue have uniformly held that subsection (a)'s 30-day rule is inapplicable to affirmative suits for fraud. Specifically, courts have found that the 30-day rule does not bar an insurer who has timely paid a claim from later (*i.e.*, outside of the 30-day window) suing the claimant for fraud in order to recoup that payment. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Liguori*, 589 F. Supp. 2d 221 (E.D.N.Y. 2008); *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, No. 04 Civ. 5045, 2008 WL 4146190, at *6-7 (E.D.N.Y. Sept. 5, 2008); *Allstate Ins. Co. v. Valley Physical Med. & Rehab., P.C.*, 555 F. Supp. 2d 335 (E.D.N.Y. 2008). The courts have distinguished such affirmative claims for fraud *after* timely payment was made, which are *not* affected by the 30-day rule, from cases in which insurers *fail* to timely pay or deny a fraudulent claim for benefits and are later sued by claimants to collect payment, which *are* governed by the 30-day rule. *See, e.g.*, *Carnegie Hill Orthopedic Servs. P.C. v. Geico Ins. Co.*, No. 3442/02, 2008 WL 852488, at *5 (N.Y. Sup. Ct. Jan. 29, 2008), *abrogated on other grounds by Fair Price Med. Supply Corp. v. Travelers Indem. Co.*, 10 N.Y.3d 556 (2008); *Liguori*, 589 F. Supp. 2d at 224-25; *Valley Physical*, 555 F. Supp. 2d at 339-41. In reaching this

26

conclusion, courts have drawn support from the absence of any language in subsection (a) explicitly barring untimely affirmative actions, an opinion by the Department of Insurance interpreting subsection (a) not to bar untimely affirmative actions, and the anti-fraud policy underlying the no-fault law.

I agree with the reasoning and conclusion of the courts that have spoken on this issue and determine that the rules set forth in subsection (a) are not implicated when an insurer brings a suit for fraud to recover payment promptly made. Accordingly, any such suit does not involve a dispute that "arise[s] pursuant to subsection (a)," and thus subsection (b)'s arbitration provision is inapplicable to the suit.[10] *See Progressive Ne. Ins. Co. v. Advanced Diagnostic & Treatment Med., P.C.*, No. 601112/00, slip op. at 16 (N.Y. Sup. Ct. July 25, 2001) (finding § 5106(b)'s arbitration clause inapplicable to civil actions for fraud to recover payments for claims under the no-fault law).

That the suit before me thus falls outside the scope of subsections (a) and (b) is consistent with the purpose of § 5106 and the no-fault law as a whole. As discussed above, § 5106 creates "[f]air claims settlement" procedures to achieve the statutory goal of the no-fault law: to speedily route compensation to people injured in car accidents. *See generally* N.Y. Comp. Codes R. & Regs. tit. 11 § 65-3.2 ("Claim practice principles to be followed by all insurers: (a) Have as your basic goal the prompt and fair payment to all automobile accident

---

[10]     Arguably, the same logic could suggest that *any* claim brought by an insurer after its timely payment of a claim for benefits would be outside the reach of subsection (b)'s arbitration clause. However, all of the claims before this Court are either claims for fraud or claims based upon the allegedly fraudulent acts, and I thus see no reason to decide whether there may be a reasonable basis for distinguishing affirmative actions based on fraud from other affirmative recovery actions. *See Country-Wide Ins. Co. v. Frolich*, 465 N.Y.S.2d 446 (N.Y. City Civ. Ct. 1983) (concluding that suit by insurer to recover payment made by mistake was subject to arbitration provision of subsection (b)); *but see State Farm Mut. Auto. Ins. Cos. v. Brooks*, 421 N.Y.S.2d 1010, 1013 n.2 (Sup. Ct. 1979), *rev'd on other grounds*, 435 N.Y.S.2d 419 (App. Div. 1981) (implying in dicta that affirmative suit by insurer to recoup benefits fraudulently claimed would be subject to arbitration clause of subsection (b)). I note, however, that claims based upon fraud may be somewhat unique in that they do not contest entitlement to benefits under the terms of the no-fault law itself but seek to recover money through an independent right of action. *See Ryder Truck Lines v. Maiorano*, 44 N.Y.2d 364, 369 (1978) (noting in dicta that subsection (b) contains "a broad arbitration clause embracing all disputes with respect to entitlement to first-party benefits arising under the statute").

victims."); *Hosp. for Joint Diseases*, 9 N.Y.3d at 317 ("New York's no-fault automobile

insurance system is designed to ensure prompt compensation for losses incurred by accident

victims . . . .") (quoting *In re Med. Soc'y*, 749 N.Y.S.2d 227, 227 (2003)) (internal quotation

marks omitted).  Allowing the suit before me to proceed outside of the strictures of § 5106 does

not significantly interfere with the important goals of the no-fault law.  If successful, affirmative

actions based on fraud may claw back money already paid, in effect slowing down the *final*

resolution of certain claims under the no-fault law.  However, in these cases the underlying

insurance claims will have been already processed, and payment on those claims promptly made.

Moreover, affirmative suits for fraud are quite rare.  Thus, the goal of the no-fault law is still

substantially achieved: Injured parties' claims for benefits meet quick resolutions, the vast

majority of which are conclusive.

   The alternative – interpreting the 30-day rule of subsection (a) to apply to and

effectively bar affirmative actions for fraud – would sacrifice too much in the name of efficiency.

Slow-to-detect fraud would be irremediable, a result difficult to reconcile with New York

Insurance Law § 409, which clearly evinces the goal of combating insurance fraud.  *See* N.Y.

Ins. Law § 409 (requiring insurance companies to adopt plans "for the detection, investigation

and prevention of fraudulent insurance activities").  In light of § 409, I am not prepared to

attribute to the legislature a single-minded purpose to promote efficiency at any expense.  My

interpretation of the scope of subsection (a) strikes a reasonable balance between the conflicting

values evinced by the statutory scheme as a whole.

   The Atlantic defendants emphasize that the arbitration clause of subsection (b)

either expressly or constructively appears in the Allstate insurance contracts.  They thus contend

that the broad policy favoring arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C

§ 2, compels me to read any ambiguities in the arbitration clause, insofar as they exist, in favor

of arbitration.  *See, e.g.*, *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665, 69 (2012).

However, as the Supreme Court has made clear, courts should "appl[y] the presumption favoring

arbitration, in FAA . . . cases, only where it reflects, and derives its legitimacy from, a judicial

conclusion that arbitration of a particular dispute is what the parties *intended* because their

express agreement to arbitrate was validly formed and . . . is legally enforceable and *best*

*construed to encompass the dispute*."  *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct.

2847, 2859-60 (2010) (emphasis added).  Here, local law mandates that disputes be arbitrable at

the option of the claimant, and the parties' agreements – *i.e.*, the Allstate insurance contracts –

merely adhere to this mandate, parroting the words of the statute or silently adopting its

provisions.  Thus the parties cannot be said to have evinced an intention or bargained for the

right to arbitrate affirmative fraud claims through their private agreements.  *See id.*  Rather, the

manifest intention of the parties, insofar as any of their agreements explicitly included an

arbitration clause, was simply to adopt and comply with local law, and I find that the best

construction of the subsection (b) excludes from its scope affirmative suits for fraud.  I thus deny

defendants' motion to compel arbitration of these claims.

    However, defendants' motion to compel arbitration is materially different with

respect to claims that Allstate has not yet paid.  For those claims – with respect to which Allstate

seeks a declaration that it need not remit payment – I find that the obligations set forth in

subsection (a) squarely apply.  By extension, disputes regarding first-party benefits that arise

with respect to those claims are subject to the arbitration clause of subsection (b).[11]  I therefore

grant defendants' motion to compel arbitration of this limited class of claims.

CONCLUSION

For the reasons set forth herein, the motions to dismiss are denied in their entirety.

The Atlantic defendants' motion to compel is granted with respect to all claims for

reimbursement that Allstate has not yet paid and denied with respect to all other claims.


So ordered.



John Gleeson, U.S.D.J.

Dated: February 16, 2012
       Brooklyn, New York

---

[11]      The Right Aid defendants also appear to ask me to dismiss these claims for declaratory relief because declaratory relief is only available there is an otherwise justiciable controversy, and defendants contend that no such controversy exists.  I find this argument to be without merit.